**ST. ANDREWS PRESBYTERIAN COLLEGE, Plaintiff,**

v.

**The SOUTHERN ASSOCIATION OF COLLEGES AND SCHOOLS, INC., Defendant.**

**No. 1:07–cv–2967–WSD.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 30, 2009.

Kent M. Weeks, Weeks, Anderson & Baker, Nashville, TN, William R. Purcell, II, Purcell & Griswold, Laurinburg, NC, Andrew C. Matteson, Lawson & Thornton, Atlanta, GA, for Plaintiff.

Patrick W. McKee, Sammie Mark Mitchell, Patrick W. McKee & Associates, Newnan, GA, Jason Richard Edgecombe, Letitia A. McDonald, King & Spalding LLP, Atlanta, GA, for Defendant.

## OPINION AND ORDER

WILLIAM S. DUFFEY, JR., District Judge.

This matter is before the Court on Defendant The Southern Association of Colleges and Schools, Inc.'s ("Defendant or SACS") Motion for Summary Judgment[1] [140], Motion to Exclude the Testimony of Plaintiff's Proffered Expert Witness Ronald Appuhn ("Motion to Exclude") [141], and Request for Oral Hearing [144], and on Plaintiff St. Andrews Presbyterian College's ("Plaintiff," "the College" or "St. Andrews") Request for Oral Hearing [183].

## I. BACKGROUND

### A. *Procedural History*

On August 24, 2007, St. Andrews Presbyterian College filed this action against Defendant in the United States District Court for the Middle District of North Carolina. Plaintiff claims that the Defendant violated the College's common law

and constitutional due process rights when SACS withdrew its accreditation of the College on June 21, 2007. The College moved for temporary injunctive relief against the revocation of its accreditation. On August 30, 2007, the district court in North Carolina entered an order temporarily restraining SACS from withdrawing St. Andrews' accreditation. On September 5, 2007, the court granted St. Andrews' motion for a preliminary injunction preventing SACS from revoking St. Andrews' accreditation. SACS appealed that order to the Fourth Circuit Court of Appeals. On November 29, 2007, the district court in North Carolina granted SACS' motion to transfer the case to this district.

After the motion to transfer was granted, SACS dismissed its appeal to the Fourth Circuit and filed a notice of appeal to the Eleventh Circuit Court of Appeals. St. Andrews moved to dismiss SACS' appeal for lack of appellate jurisdiction. On March 28, 2008, the Eleventh Circuit granted St. Andrews' motion and dismissed the appeal for lack of jurisdiction, finding it did not have jurisdiction to review the preliminary injunction granted by the Middle District of North Carolina.

On December 8, 2008, Defendant filed its Motion for Summary Judgment. St. Andrews opposes the motion.

### B. *Statement of Facts*

#### 1. *The SACS Review Process*

SACS is a non-profit membership corporation incorporated under the laws of Georgia. Its membership is composed of educational institutions in eleven southern states and Latin America. SACS operates through a Council for the Advancement of .

---

1. In a discussion with counsel for the parties on November 21, 2008, the parties agreed that the issues presented in this litigation could be addressed by SACS filing its summary judgment motion and the Plaintiff responding. This avoided the redundant briefing that would have been required if the parties filed separate summary judgment motions.

School Improvement (the "Council") and a Commission on Colleges (the "Commission"). The Commission on Colleges is recognized by the United States Department of Education as the regional body for accreditation of higher education institutions in the southeast, including in North Carolina. The Commission is composed of seventy-seven (77) elected Commissioners who typically hold administrative positions at institutions that are members of SACS. The Commission meets in June and December of each year and at each meeting makes final accreditation decisions regarding more than 100 member institutions.

To be accredited, SACS requires that its member institutions comply with the *Principles of Accreditation: Foundations for Quality Enhancement* ("*Principles*"). Once an institution is initially accredited, accreditation is first reaffirmed in five (5) years and every ten (10) years thereafter if the institution encounters no significant problems. Member institutions may be required to submit Fifth–Year or Ten–Year Reports at the middle or end of this regular decennial review period. Such reports address the institution's continued compliance with the *Principles*. When specific concerns arise regarding an institution, the Commission may begin specially monitoring that institution, outside the regular decennial review period, for up to two years. Depending on the severity of the issues involved, SACS may put the institution on notice or impose a public sanction in the form of a warning or, more seriously, probation. A public sanction is imposed for either six or twelve months at a time. Any of these actions—notice, warning, or probation—triggers a monitoring period. At the end of the monitoring period, an institution must submit a Monitoring Report. A Monitoring Report is an institution's status report presenting its position concerning its compliance with the *Principles* and its correction of any deficiencies SACS identified. If an institution has not, by the end of its monitoring period, remedied the deficiencies identified by SACS as the basis for the sanction, its accreditation must be removed unless the institution demonstrates "good cause" for why it should not be removed from membership.

During the monitoring period, SACS forms a Special Committee of administrators, composed of individuals from member institutions, to visit the institution under review. The Special Committee is supported by a paid SACS staff member liaison who provides accreditation-process assistance to both the Special Committee and the institution. After the Special Committee visits and reviews those materials submitted by the institution for use in the review process, it prepares a report in which it makes findings and recommendations regarding whether the institution is in compliance with the *Principles* and the areas of needed improvement to be in compliance. The report is provided to the institution and a group of three to four "Readers," individuals who advise SACS' Committee on Compliance and Report ("C & R Committee") on accreditation recommendations. An institution may submit a written response to the report if it is submitted to the C & R Committee no later than two weeks in advance of the Commission meeting. The Readers also receive from the staff liaison a "Confidential Memorandum," a document containing the staff liaison's recommendation and analysis on whether the institution has complied with the *Principles*.[2] The memorandum states on its face that it is not intended to "substitute for the committee's own collective professional judgments." AR 1112. The Readers also review the institution's Monitoring Report, the Special Committee's report, and the response to the Special Com-

---

2. The institution does not receive a copy of the Confidential Memorandum.

mittee report, collectively referred to by SACS as "primary resource materials," before making any recommendations.

Following the Readers' review of the relevant materials, the Lead Reader completes "Form F," a standardized SACS form that contains the Readers' reasoning and recommendation regarding the institution. A Special Reader, such as a "Finance Reader," also produces a report[3] assessing the institution's compliance with the *Principles.* Form F and the Special Reader's report are provided to the C & R Committee for its review.

The C & R Committee meets at the semi-annual meeting of SACS. Each C & R Committee consists of fifteen to eighteen Commissioners who make initial recommendations regarding the accreditation of thirty to forty member institutions. The three to four Readers on the C & R Committee are the only individuals who have access to the primary resource materials. The remaining members on the C & R Committee are given Form F, the Special Reader's oral report, and the staff liaison's Confidential Memorandum. They also hear a ten-minute oral presentation from a representative of the institution.

Each C & R Committee then presents its accreditation recommendations during a two-hour meeting of the Executive Council, a group of thirteen Commissioners. The Executive Council does not review primary resource material or hear from any institution representative. The Executive Council's role is not to review the substance of each institution's case, but rather to determine whether the policies of the Commission have been applied consistently with respect to each institution. Following the C & R Committee presentations, the Executive Council makes its final accreditation recommendations to the full 77–member Commission, which makes the final accreditation decisions for each institution. The Commission, like the Executive Council, does not hear from the institutions and does not review any primary resource materials.

If an institution is removed from membership, it may submit a request for an appeals hearing to the SACS Appeals Committee. The request must be made in writing and include a $15,000 deposit to cover the costs for the appeal. At least fourteen (14) days before the appeals hearing, the institution must submit the brief it intends to present at the hearing. The brief may only be based on the Administrative Record, which is the compilation of documents the Commission used in making its decision, and may not include or refer to additional documents or materials. The Administrative Record is provided by SACS to the hearing officer handling the appeal and to the institution. The institution bears the burden of proof throughout the appellate process. The Appeals Committee's decision to affirm the Commission's decision is final and is not subject to further appeal.

### 2. *The College's Review*

St. Andrews is a private, residential, church-related, four-year college in Laurinburg, North Carolina. SACS initially accredited the College in 1961. In December 2000, SACS affirmed the College's accreditation, though it placed St. Andrews on notice for concerns regarding standards on planning, evaluation, and financial resources. SACS monitored the College for the next two years. In December 2002, SACS asked St. Andrews to provide a Fifth–Year Report addressing the College's financial resources. St. Andrews' Fifth–Year Report showed that unrestricted net assets had declined from $1,704,068 in 2002 to -$524,325 in 2003, to -$5,035,619 in 2004. One reason for the decline in

---

**3.** SACS states that the Special Reader's re- port is not a written document.

unrestricted net assets was that the College's operating expenses exceeded its operating revenues. The College's total net assets at the beginning of 2003 were $17,947,739. By 2004 the assets declined to $11,191,627.

On July 11, 2005, the Commission placed the College on "warning" for six months and required it to submit a Monitoring Report by December 2005. When placed on warning, St. Andrews was advised it was not in compliance with certain of the *Principles,* including: 1) Core Requirement 2.2, which requires a governing board to provide oversight and ensure adequate financial resources; 2) Core Requirement 2.11.1, which requires that an institution has a sound financial base and demonstrated financial stability; 3) Comprehensive Standard 3.10.1, which requires that the institution's recent financial history demonstrates financial stability; and 4) Comprehensive Standard 3.10.4, which requires the institution exercise appropriate control over its finances. The College was required, in the Monitoring Report, to show that it was in compliance with these *Principles.* Placing the College on this formal sanction commenced a two-year monitoring period during which the College was required to comply with the *Principles* by June 2007 or, absent good cause, be disaccredited and dropped from SACS' membership.

After the College submitted its Monitoring Report, a Special Committee made an on-site visit to St. Andrews on October 31 through November 1, 2005. Following its visit and review of the Monitoring Report, the Special Committee found that "[w]hile the institution has experienced a history of financial challenges, it is beginning to make progress in several critical areas." Administrative Record ("AR") at 400. The Committee determined, however, that the College had not fully complied with SACS' financial standards and, as a result, the Commission placed St. Andrews on twelve-month Probation. It also requested St. Andrews to complete a Second Monitoring Report and permit a Special Committee visit in 2006.

The College submitted its Second Monitoring Report in October 2006. The Special Committee found that while the College had failed to provide a sound financial base and failed to demonstrate financial stability, St. Andrews had established positive trends in enrollment, revenue from net tuition and fees, and unrestricted private gifts and grants. The Special Committee also found that the College's "academic programs were high quality programs that were adequately resourced." AR at 624. The Committee cited the College's improved consolidated financial index ratio ("CFI")[4] as "the most positive indicator of improvement in the institution's financial status seen during this visit." AR at 626. According to the Special Committee, the CFI is a widely accepted method to measure the financial stability of an institution. The threshold for financial health is a CFI of 3.0. St. Andrews' CFI for 2003 was –7.72; for 2004 was –10.09; for 2005 was –9.56; and for 2006 was –1.81. Following a review of the Second Monitoring Report and the Special Committee Report, the Commission concluded that the College was still not in compliance with the *Principles* and, on January 9, 2007, imposed an additional six-month Probation.[5]

---

4. Both SACS and St. Andrews refer to CFI alternatively as "consolidated financial index" and "composite financial index." The parties agree on the actual index figures for the dates relevant to accreditation.

5. The College maintains that the Readers initially recommended continuing St. Andrews' Probation for one year, but that the SACS' staff erroneously advised the Readers that St. Andrews' probationary period could only be

The Commission required the College to submit a Third Monitoring Report by May 4, 2007, which was to include an audit from the most recent year. There is some dispute as to whether this requirement referred to the College's completed 2006 audited financial statements, or, because the Third Monitoring Report was due before the end of St. Andrews' fiscal year, it referred to the 2007 financial statements (a draft followed by an actual audit) based on 11 months of the fiscal year. In a series of email exchanges on December 4, 2006, members of the C & R Committee and SACS members discussed the potential problem the six-month Probation period would present. One member stated that six months "will not allow them time to have an audit for FY 2007 completed[.]" St. Andrews Ex. 18 at 5391. Another member wrote: "another audit seems essential to making any decision." *Id.*

An initial set of minutes of the C & R Committee stated that St. Andrews was required to submit financial audit reports for the three most recent fiscal years, and that the most recent year "is defined as the fiscal year ending immediately prior to the due date of this report." St. Andrews Ex. 19, December 8–10 C & R Committee Minutes at 1023. However, on March 19, 2007, SACS staff member Carol Luthman sent an email to Bridgette Douglas stating: "Please change the December 2006 minutes for St. Andrews from that which was posted to what is attached. It was not your error. Changes were made to the letter that the support staff member did not make to the minutes. If both are not exact, we could be in major trouble so this

is very important." St. Andrews Ex. 20 at 5088. The revised minutes attached were changed to state: "The most recent year is defined as the fiscal year 2006–2007." *Id.* at 5089. SACS Commission President Belle Wheelan (an employee of SACS) sent a letter to St. Andrews reflecting the change. AR at 20.

The record shows the College wanted to submit audited financial information for SACS's use in reaching its accreditation decision. The College proposed that it be allowed to submit its audited information by June 18, 2007, after the College provided its Third Monitoring Report. St. Andrews Reply to Def. Statement of Material Facts, Tab 51. The College acknowledged this request was a departure from ordinary accreditation review practices. *Id.* SACS agreed to allow the College additional time to prepare audited information for SACS to review. To ensure its review would be informed, SACS asked the College:

1. To provide a draft copy of the audit before the Special Committee's visit to the College and to make the College's auditors available to meet with the Committee during its visit; and

2. That the audited financials be provided by June 14, 2007 along with information identifying any differences between the draft and final audit numbers and an explanation of those differences.

*Id.* at Tab 53. There is evidence in the record that this process was followed.

---

extended for six months. While St. Andrews was placed on Warning in June 2005, it was not placed on Probation until after the December 2005 Commission meeting. The maximum consecutive time that an institution may be on Probation is two years. SACS' sanctions policy contemplates continuing an institution's membership beyond the maximum two-year monitoring period if the institution shows "good cause." Sanctions Policy at 2. Thus, it appears the College's accreditation and Probation could have been extended to December 2007 if it showed good cause, even beyond the June 2007 completion of the monitoring period.

The Special Committee visited St. Andrews on May 24–25, 2007. The Committee created a report based on St. Andrews' Third Monitoring Report and the Committee's findings following its visit to the College. The Committee, as agreed, used St. Andrews' draft 11–month financial statements to make its report. The Special Committee sent a copy of its final report to the College on June 4, 2007. The report found that St. Andrews complied with Core Requirement 2.2 and recommended to the Commission that the College demonstrate compliance with the three sections of the *Principles*—CR 2.11, CS 3.10.1, and CS 3.10.4—dealing with financial resources. The report also indicated that although St. Andrews' CFI improved from –1.8 in 2006 to a positive range of 1.4–2.1 in 2007, this "isolated area of improvement was not deemed sufficient to bring the institution into compliance." AR at 1056.

Any written response to the Special Committee report is required to be submitted to SACS at least two weeks prior to the Commission meeting, which in this case, if strictly applied, gave the College only one day to submit a written response. Although allowed, the College did not ask for an extension of this deadline. The draft financial statements initially were provided to the C & R Committee. St. Andrews' 11–month audit was provided after it was completed and before the Committee reached its decision to recommend the College's accreditation be withdrawn.

The C & R Committee, having the Special Committee report and the audited financials, also heard an oral presentation from the College.[6] During the June 2007 meeting, the C & R Committee recommended removing St. Andrews from

membership for failure to comply with requirements on financial resources, financial stability, and control of finances. This recommendation was referred to the Executive Council. The Executive Council, and ultimately the Commission (the final decision-maker), adopted the recommendation. On June 27, 2007, the Commission notified the College that it had removed its accreditation.

The College appealed and appeared before the SACS Appeals Committee on August 22, 2007. The Appeals Committee sent a letter to the College the next day informing St. Andrews that it had affirmed the decision of the Commission.

## II. DISCUSSION

### A. The Standard on Summary Judgment

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir.1999). Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir.1999). The non-moving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings." *Id.*

---

**6.** St. Andrews claims that it did not know the C & R Committee was relying on outdated financial data before it made its ten-minute oral presentation. However, the record shows the College provided audited financials and knew of any differences between the draft and final audit. The record also shows the C & R Committee Readers had the final audit.

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). Where the record tells two different stories, one blatantly contradicted by the evidence, the Court is not required to adopt that version of the facts when ruling on summary judgment. *Id.* "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury...." *Graham,* 193 F.3d at 1282. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." *Herzog,* 193 F.3d at 1246. The party opposing summary judgment "'must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Scott,* 550 U.S. at 380, 127 S.Ct. 1769 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A party is entitled to summary judgment if "the facts and inferences point overwhelmingly in favor of the moving party, such that reasonable people could not arrive at a contrary verdict." *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir.2002) (internal quotations omitted).

### B. *Common Law Due Process in the Accreditation Process*

St. Andrew argues it was denied common law due process in SACS' decision to withdraw the College's accreditation. The Court addresses first whether common law due process applies in the accreditation context.

In *Hiwassee College, Inc. v. The Southern Ass'n of Colleges and Schools,* 531 F.3d 1333 (11th Cir.2008) ("*Hiwassee*"),

Hiwassee College claimed SACS denied it common law due process in the decision to withdraw Hiwassee College's accreditation, squarely raising the issue whether common law due process applies to accreditation decisions. The Eleventh Circuit found it unnecessary to address directly whether accrediting agencies "have a common law duty to employ fair procedures when making decisions affecting their members." *Id.* (quoting *Thomas M. Cooley Law School v. The Am. Bar Ass'n,* 459 F.3d 705, 711 (6th Cir.2006)), stating that even if SACS were subject to any common law due process requirements in terminating Hiwassee's accreditation, Hiwassee had not been denied due process in SACS' decision not to continue its accreditation of the institution. *Id.* at 1335. In reaching its decision, the Eleventh Circuit elected to apply the standard of review stated by the Sixth Circuit in *Cooley.* In *Cooley,* the court said that common law due process requires a court to determine "whether the decision of an accrediting agency ... is arbitrary and unreasonable or an abuse of discretion and whether the decision is based on substantial evidence." *Id.* at 1335 n. 4. Assuming that common law due process was required, the Eleventh Circuit explained that Hiwassee had failed to show that SACS' decision to terminate Hiwassee from its membership was arbitrary or capricious. *Id.* at 1335.

In *Cooley,* the Sixth Circuit, in discussing what must be shown to prove a common law due process violation in an accreditation context, explained that "great deference should be afforded the substantive rules of these [accrediting] bodies and courts should focus on whether an accrediting agency ... followed a fair procedure in reaching its conclusions." 459 F.3d at 713. The court held that it was not free to conduct a *de novo* review of an accrediting agency's decision, or substitute its own judgment for that of the accrediting body.

*Id.* A court must instead focus on whether the agency "conformed its actions to fundamental principles of fairness." *Id.*

The right to common law due process was developed by courts "as a check on organizations that exercise significant authority in areas of public concern such as accreditation and professional licensing." *Cooley,* 459 F.3d at 712. The Fifth Circuit held, in *Wilfred Academy of Hair & Beauty Culture v. SACS,* 957 F.2d 210, 214 (5th Cir.1992), that courts afford accrediting agencies' decisions great deference and "focus primarily on whether the accrediting body's internal rules provide a fair and impartial procedure and whether it has followed its rules in reaching its decision." The *Cooley* court's reasoning is sound and it tends strongly to defer to accreditation decisions reached by accrediting organizations which institutions elect to join.

### C. *Analysis*

The College argues that SACS denied it common law due process claiming that SACS' accreditation process is fundamentally unfair and that SACS failed to follow its own procedures in removing St. Andrews' accreditation. The College claims that SACS did not provide it adequate notice of its standards of accreditation and denied St. Andrews a meaningful opportunity to be heard, making SACS' decision to remove St. Andrews' accreditation arbitrary and unreasonable. The College also claims SACS violated St. Andrews' constitutional due process rights.

Assuming common due process applies, the essential questions for the Court are whether there are any genuine disputes of material fact regarding SACS' internal procedures, whether those procedures are unfair so to deny common law due process, whether any alleged failure to follow SACS accreditation review and removal procedure occurred and, if so, whether the failure resulting in the decision to withdraw the College's accreditation was arbitrary and unreasonable, an abuse of discretion and not based on substantial evidence. The Court concludes that material disputed facts do not exist [7] and that the College was not denied common law due process, assuming it had such rights to begin with.

The Court begins its analysis by noting that St. Andrews asserts many of the same claims and violations asserted, and ultimately rejected, in *Hiwassee Coll. v. Southern Ass'n of Colleges and Schools, Inc.,* 2007 WL 433098 (N.D.Ga. Feb. 5, 2007) ("*Hiwassee I*"), *aff'd,* 531 F.3d 1333 (11th Cir.2008). It is significant that the procedures SACS used in removing St. Andrews' accreditation are identical to those applied by SACS in removing Hiwassee's accreditation, which both the district court and the Eleventh Circuit found met the requirements of "common law due process," to the extent such due process requirements exist in the accreditation process. Thus the Court finds the accreditation process and procedures provided by SACS here, as they were in *Hiwassee,* met the requirements of common law due process and the College's claim that they did not is unfounded. To the extent the College's claims are not otherwise factually or materially distinguishable from those asserted by Hiwassee, the Court rejects them here. Nevertheless, because accreditation cases are necessarily fact-intensive, the Court carefully considers the factual allegations supporting each of the College's claims that are different from the claims asserted in *Hiwassee I.*

---

7. The College does not dispute the facts of the process of the accreditation decision but whether the process and decision complied with due process. The Court finds the material facts undisputed for the purpose of deciding the College's due process claims.

### 1. Sufficient Notice

Plaintiff claims SACS failed to provide sufficient notice of the compliance requirements because they are "so vague that they give no notice to the college as to what it must do to bring itself in compliance." Pl. Resp. at 22. St. Andrews argues that the Commission does not have set standards or benchmarks for determining compliance, making SACS' standards a "moving target" based on "subjective opinions of varying peer evaluators." Id. at 22–23. The College claims the Commission never told St. Andrews that it had to balance its budget by a certain date or achieve particular debt-to-equity ratios to be in financial compliance.

SACS argues that even if the concepts of sound "financial base" and "demonstrated financial stability" are not defined by objective criteria, the standards are not vague. SACS claims that it accredits a wide variety of institutions and thus it is inappropriate and unwise to adopt a universal definition for financial stability. SACS argues further that the "severity of the College's financial position ... did not present a close case." Def. Reply at 7. That is, under any definition—narrow or broad—the College's financial base was unsound and the College was suffering significant and material financial instability.[8]

■ Accrediting agencies are to be afforded great deference in their interpretation of their substantive rules, and these interpretations should be upheld unless "clearly erroneous." See Cooley, 459 F.3d at 714. An accreditor is also "entitled to make a conscious choice in favor of flexible standards to accommodate variation in purpose and character among its constituent institutions...." Parsons College v.

North Central Ass'n of Colleges and Secondary Schools, 271 F.Supp. 65 (N.D.Ill. 1967).

The weight of authority permits an accrediting agency such as SACS to maintain flexible standards to allow it to accredit a wide variety of institutions. An exact definition of financial stability is not required to satisfy common law due process. The court rejected this same "lack of objective criteria" claim made by the plaintiff in Hiwassee I. In Hiwassee I, the institution argued that SACS did not provide definitive requirements to permit the school to demonstrate "financial stability" pursuant to Section 2.11 of the Principles. The Hiwassee I court found that the Special Committee's findings and recommendations sufficiently addressed financial matters relevant to the "financial stability" standard and rejected the agreement that the standard was insufficiently clear. Hiwassee I, 2007 WL 433098, at *5 n. 5. The Court of Appeals agreed the standard was sufficiently stated and it agreed with the District Court's decision that SACS' policies and procedures did not violate common law due process standards. Hiwassee, 531 F.3d at 1335. SACS' compliance requirements are not impermissibly unspecific. To the contrary, they provide sufficient notice to member institutions and thus do not violate common law due process standards.

### 2. Opportunity to be Heard

Plaintiff claims that its common law due process rights were violated because it did not have a meaningful opportunity to be heard at each level of SACS' review. Plaintiff specifically claims it was not permitted to present evidence directly to the Executive Council or the Commission. This same argument was rejected by the

---

8. In reaching its decision, SACS acknowledged the College was experiencing a positive
trend.

district court in *Hiwassee I*: "There is nothing unusual in a tiered review system in limiting the amount of information available for review at higher levels. Hiwassee has pointed to no due process requirement that all levels of review receive the full record of decision-making. It would be inefficient process if all bodies started from the ground up in their review of the Special Committee's recommendation." *Hiwassee I*, 2007 WL 433098, at *16. The District Court's reasoning and opinion was affirmed by the Eleventh Circuit, and the Court finds there is no due process violation here simply because St. Andrews was not permitted to present evidence at every level of review.

St. Andrews next argues that its due process rights were violated because SACS failed to follow its own internal procedures. St. Andrews claims that SACS' policy is that a college's financial stability is to be assessed using a year-end financial audit and yet SACS required the College instead to submit an 11–month audit. St. Andrews also claims that although it submitted the final 11–month audit to the Commission after the Special Committee's visit, only the draft statements, and not the final audit, were incorporated in the Confidential Memorandum and other materials given to the C & R Committee, to the Executive Council, and to the ultimate decision-maker, the Commission. The College's arguments misrepresent the facts and what was available to the C & R Committee and its Readers before an accreditation recommendation was made. What was put into place, in consultation with St. Andrews, was a process that provided the Special Committee, and the decision-makers above them, with financial information necessary to evaluate efficiently the College's financial position so that SACS could reach an accreditation decision.

SACS developed, in consultation with the College, a two-step process to provide for the flow of financial information for ultimate use by the Special Committee, the C & R Committee and the Commission in making an accreditation decision. The first process involved the submission of draft financial statements and a draft audit to the Special Committee for its use during the on-site visit. This step also involved Committee interviews with the College's auditors about the financial information that had been and was being developed. The second step involved the submission by the College of its audited 11–month financials, which were provided to the Readers on the C & R Committee and available to the Committee itself before it made its accreditation recommendation. The College also was requested to provide information about variances between the draft and audited financial information to direct reviewers to any differences in the information submitted. This stepped process provided the College ample opportunity to prepare the financial facts of its condition before a decision was made. St. Andrews necessarily must admit that the final 11–month audit, which it claims is important, was in fact submitted to the Readers on the C & R Committee. Although St. Andrews states that three of the Readers received the audit only two days before the C & R Committee met, and one Reader did not receive the audit until the first day of the meeting, suggesting there was insufficient time meaningfully to digest it, this argument ignores the two-step process, including the opportunity for the College to identify and explain any variances between the draft and final audits, in place to allow an efficient process to review and understand the audit report.

The College alleges further that it was not allowed to provide information to the C & R Committee, Executive Council or Commission to show the variance—and claimed improvement of financial stability—reflected in the final 11–month audit.

St. Andrews contends that the decision to require 2007 draft statements resulted in an accreditation decision based on financial data less favorable than that presented in the 2006 financial audit, the last available year-end financial audit. Again, the facts are that final audit information was made available to the C & R Committee and its Readers and the College had sufficient opportunity to present any variation in the final audit numbers and to explain the significance of any variation. The record supports that the information available to the ultimate decision-makers did not contain materially inaccurate or unreliable data.

Even if the audited information had not been provided, a due process violation could be sustained only if the financial figures in the 11–month audit were materially different and better than the financial performance indicated in the draft financial statements. If they are not materially different, any alleged failure to submit the financial audit to the C & R Committee, Executive Council, and ultimately the Commission would be harmless error.[9]

 The only "evidence" the College offers to support its claim that the 11–month financial audit results were significantly improved over the draft financial statements it submitted is the affidavit of Dr. Ronald Appuhn. Mr. Appuhn states: "If the C & R Committee concluded that the final 11 month audit showed St. Andrews in a worse state than the draft financial statements initially provided to the Special

Committee and readers, that conclusion was in error." Appuhn Decl. at ¶ 16. This statement does not support the proposition that the financial data in the audit was significantly improved over the draft financial statements, and St. Andrews does not point to any evidence showing there was any meaningful or material difference in the data. St. Andrews points to reasons why it contends the school was on a positive financial trajectory when its accreditation was removed. Positive financial trajectories—whatever that means—is not evidence of financial stability. Financial trajectories also are not the standard of review. The Court will not act as a "super-accreditation" body to evaluate whether SACS' accreditation decision was right or wrong, or whether the Court would have ultimately reached a different conclusion.

The question is one of process: did the accreditation review process here violate any common law due process rights the College may have had because the product was an arbitrary, capricious or unreasonable accreditation decision that was not based on substantial evidence. The Court necessarily concludes the process was fundamentally fair and that the College was allowed to present sufficiently complete information about its financial condition and operations. That St. Andrews disagrees with SACS' conclusions and determination does not demonstrate that it was denied due process. St. Andrews concedes that the Readers on the C & R Committee had

---

9. St. Andrews spends a significant amount of time arguing that due process requires each level of SACS' accreditation process to be a virtual *de novo* review of all the documentation and materials reviewed by the Special Committee. This argument was rejected by the Eleventh Circuit in affirming *Hiwassee I*. SACS' procedures provide adequate common law due process, assuming the College is entitled to it. The relevant question for the Court is whether the levels of review in the accredi-

tation process all relied on materially less favorable financial figures due to SACS' allegedly arbitrary and unjustified change in its procedures, when it required St. Andrews to submit draft financial statements after initially requiring it to submit a financial audit based on the last complete fiscal year. The Court concludes the record does not contain evidence the 11–month audit establishes materially better financial performance.

access to the final 11–month audit, even if that access was allowed on a timetable different from the one initially anticipated. Having almost an additional full-year's audited financial data, the C & R Committee nonetheless recommended revoking St. Andrews' accreditation. The Court concludes that St. Andrews has not shown that it was denied common law due process in the accreditation review procedure and, in fact, the College does not even show that the financial data in the 11–month audit was significantly improved over the draft financial statements such that SACS' decision was arbitrary, capricious or unreasonable.[10]

The College next argues that it did not have an opportunity to be heard because it did not have sufficient time to respond to the Special Committee report. St. Andrews claims that SACS' policy requires institutions to submit a written response to the Special Committee report at least two weeks before the Commission's biannual meeting. Based on when the Special Committee report was given to the College, St. Andrews only had one day to submit a written response. Because of the short time period, the Special Committee chair and the staff liaison advised St. Andrews not to submit a written response and instead to focus on preparing an argument for extending accreditation for good cause. St. Andrews claims it made its ten-minute oral presentation to the C & R Committee without knowing the Committee only had the draft financial statements, and not the allegedly more favorable financial audit. The Court notes that the College did not request an extension of time to submit a written response to the Special Committee's Report and did not provide any ex-

planatory information when the final audit was submitted.

SACS responds by arguing that the College already been delivered a "substantially similar draft" of the final Special Committee report, that the College could have requested a waiver and extra time to respond, but did not make such a request. Even if SACS did not afford the College common law due process in this instance by permitting St. Andrews insufficient time to submit a written response to the Special Committee report—which the Court does not find occurred—St. Andrews has failed to identify any specific evidence that the 11–month financial audit was materially more favorable than the draft financial statements. There is no genuine factual dispute whether the accreditation process resulted in inaccurate or inadequate financial information was used to make the decision to withdraw the College's accreditation and thus there is not a basis to conclude that SACS' accreditation decision was arbitrary, unreasonable or capricious so as to deny the College common law due process.

Plaintiff next claims it did not have a meaningful opportunity to be heard because it was not able to provide new evidence to the appeals committee. Hiwassee was subject to this same restriction, and the Eleventh Circuit found that it did not constitute a due process violation. This claim is without merit.

3. *Alleged Violation of SACS' Policies*

Plaintiff claims that SACS also violated common law due process because it violated its own policies in removing St. Andrews' accreditation. Specifically, Plaintiff claims: 1) SACS appointed a member to the Special Committee who had a conflict

---

**10.** Although not considered by the Court in reaching its decision today, SACS claims that St. Andrews' final *12–month* 2007 audit shows the College to be in even worse finan-

cial condition than the 11–month audit, indicating any financial improvement St. Andrews allegedly experienced was decidedly short-lived.

of interest; 2) SACS failed to appoint a sufficient number of "financial reviewers" to the May 2007 Special Committee; 3) SACS secretly altered the Commission's 2006 decision that St. Andrews' 2007 review be based on its 2006 financial audit [11]; 4) SACS failed to include key documents in the Administrative Record; and 5) SACS failed to appoint a hearing officer to the Appeals Committee who was elected by SACS' member institutions as required by SACS' policy. None of these claims, alone or in the aggregate, support the College's contention that its common law due process rights were violated.

### a. Conflict of Interest

■ The College argues that a member of the Special Committee, Dr. Sarah Laws, had a conflict of interest because her institution, Midway College, was competing with St. Andrews to expand its equestrian program into North Carolina. Plaintiff claims Dr. Laws' rude and unprofessional behavior during questioning by the Special Committee evidenced her conflict of interest.

SACS' policy prohibits participation in the accreditation process by someone whose professional situation could impair the exercise of impartial, objective judgment. SACS claims that Dr. Laws' situation does not create a conflict of interest as it interprets "conflict of interest," and that Dr. Laws was not aware that St. Andrews had an equestrian program until she was asked to serve on the Special Committee.

The Court finds that while there are conflicting claims whether Dr. Laws had a conflict of interest, St. Andrews has failed to show that the alleged conflict caused it any injury or otherwise affect the accredi-

tation process. *See Hiwassee College, Inc. v. SACS,* 490 F.Supp.2d 1348 (N.D.Ga. 2007) (*"Hiwassee II"*) (rejecting institution's conflict of interest claim because college could not show that any conflict of interest caused its alleged injury).[12]

### b. Financial Reviewers

Plaintiff contends the Special Committee did not have enough financial reviewers "despite the Committee's focus on financial issues." Pl. Resp. at 26. SACS argues that the College does not cite any requirement that a minimum number of financial reviewers are required to serve on the Special Committee.

The College does not provide any support for its conclusory assertion that the Special Committee did not have enough financial reviewers, and St. Andrews did not establish that SACS' policies or due process required a greater number of reviewers. The College did not present any evidence that the Special Committee was unable to perform its function because it had too few financial reviewers or that a greater number of reviewers would have affected the Special Committee's findings. St. Andrews' claim is without merit.

### c. Administrative Record

Plaintiff contends that SACS failed to include key documents in the Administrative Record SACS provided to the College, including reports and minutes of the C & R Committee and the Executive Council. The College claims these documents show the information that was considered by SACS in making its decision and provides the name of those participating in the decision.

---

**11.** The Court has already addressed this claim, *supra,* and found that there is no evidence that the financial audit was materially more favorable than the draft financial statements to create a genuine dispute of material fact.

**12.** In *Hiwassee II,* the court ruled on a motion for entry of the judgment ordered in *Hiwassee I.*

SACS claims that it is undisputed that it does not interpret its policies to include these documents in the administrative record, and this decision is entitled to deference. *See Cooley,* 459 F.3d at 714. SACS also asserts the College does not argue that it was damaged or harmed by these documents' not being included in the record.

The district court in *Hiwassee I* addressed a claim similar to the one presented by the College here. The Court, like the court in *Hiwassee I,* does not need to reach this issue because St. Andrews does not present any evidence to show that the failure to include these documents in the Administrative Record did or would have affected SACS' decision. *Hiwassee I,* 2007 WL 433098, at *12.

#### d. Hearing Officer

Finally, the College claims, without any support, that the hearing officer appointed to the Appeals Committee, Steve Emens, was not "elected" as envisioned by SACS' policies. The College claims Dr. Emens testified that he did not know who elected or appointed him. The Court finds that Dr. Emens' lack of knowledge regarding how he was chosen for the Appeals Committee does not constitute evidence that he was not elected, and St. Andrews has not presented any evidence that he was not elected or that his service as a hearing officer caused Plaintiff any injury. *Hiwassee II,* 490 F.Supp.2d at 1349–50.

#### 4. *Substantial Evidence*

Plaintiff contends that SACS' decision was not based on substantial evidence and therefore was arbitrary and unreasonable. Plaintiff claims that SACS' decision to remove St. Andrews from its membership rested on its conclusion that St. Andrews did not meet SACS' requirements for financial stability and for maintaining a sound financial base to support the institution's mission, programs and services. Plaintiff argues that SACS has not identified a single program or service provided by the College that was not adequately supported and thus the accreditation decision was not based on substantial evidence.

SACS' interpretation of its requirements for financial stability and a sound financial base is entitled to deference.[13] *Cooley,* 459 F.3d at 714. SACS has presented ample evidence supporting its decision that St. Andrews had longstanding financial problems and shortcomings. The College's disagreement with SACS' ultimate findings and conclusions does not constitute a claim for a violation of common law due process. SACS monitored St. Andrews and placed the College on sanctions for two years before ultimately deciding to remove St. Andrews' accreditation. St. Andrews fails to show that it was denied common law due process, or that SACS' decision to terminate the College's accreditation based on St. Andrews' precarious financial condition was arbitrary, unreasonable and capricious.

#### D. *Constitutional Due Process*

■ Plaintiff argues that SACS violated its constitutional due process rights in removing its accreditation. First, this claim is deemed abandoned. St. Andrews did

---

**13.** SACS has filed a Motion to Exclude the Testimony of Plaintiff's Proffered Expert Witness Ronald Appuhn. A review of the proposed testimony shows that Appuhn would testify about his experience in educational finance. Because the Court finds that SACS is entitled to deference regarding its interpretation of its financial requirements, and that these requirements were upheld by the Eleventh Circuit in *Hiwassee,* even if the Court considered Appuhn's testimony, SACS' financial requirements, and its review process generally and as implemented here, do not violate common law due process. The Court thus does not need to reach the issue of whether Appuhn's testimony should be excluded, and the motion is denied as moot.

not respond to SACS' motion for summary judgment or this claim. Failure to respond to an opposing party's arguments regarding a claim constitutes abandonment of that claim, and warrants dismissal of the abandoned claim. *Bute v. Schuller Int'l, Inc.*, 998 F.Supp. 1473, 1477 (N.D.Ga.1998) ("Because plaintiff has failed to respond to this argument or otherwise address this claim, the Court deems it abandoned."); *Welch v. Delta Air Lines, Inc.*, 978 F.Supp. 1133, 1137 (N.D.Ga.1997) ("Plaintiff's failure to respond to Defendant's argument alone entitles Defendant to summary judgment on these claims.").

Second, the Eleventh Circuit explicitly rejected this identical claim against SACS in *Hiwassee.* 531 F.3d at 1335 ("reject[ing] Hiwassee's argument that SACS is a government actor bound by the Fifth Amendment's due process clause"). Plaintiff's claim of a constitutional due process violation is without merit.

### E. *Availability of Damages*

■ Finally, in addition to injunctive relief, Plaintiff requests relief in the form of monetary damages. SACS responds that damages are not available to remedy a violation of due process. SACS also argues that the cases cited by St. Andrews do not support its claim for damages. The Court agrees.

Plaintiff relies on *Rosen v. Cascade International,* 21 F.3d 1520 (11th Cir.1994) and *United Steelworkers of America v. USX Corp.,* 966 F.2d 1394 (11th Cir.1992) for the general proposition that damages can be awarded in addition to any injunctive relief. Neither case concerns a due process violation. Plaintiff has not provided any authority to support its claim for damages. That the College cannot sustain a claim for a common law due process violation is further reason the College is not entitled to damages or any other remedy.

### III. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [140] is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude the Testimony of Plaintiff's Proffered Expert Witness Ronald Appuhn [141] is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** that Defendant's Request for Oral Hearing [144] and Plaintiff's Request for Oral Hearing [183] are **DENIED.**[14,15]

14. The parties each requested an oral hearing on this motion. The Court generally decides motions without oral hearing. LR 7.1E, NDGa. SACS submitted a record of over 1100 pages supporting its motion, St. Andrews responded with a similarly voluminous record, and dozens of deposition transcripts were submitted. The Court does not believe that oral argument would have aided the resolution of any of the issues presented in this motion.

15. As a final matter, as the Court observes that SACS' litigation conduct in this action has been disturbing. Although the Court informed SACS that the order granting preliminary injunctive relief was not appealable because it was not a final order, and predicted that the Court of Appeals would summarily dismiss the appeal, SACS persisted with this litigation strategy, seemingly intent on seeking early vindication of its accreditation decision. The appeal was summarily dismissed by the Court of Appeals for lack of jurisdiction. Thereafter, various disputes arose regarding SACS' conduct in discovery, causing the Court to convene a hearing on December 22, 2008, to consider the disputes that had arisen. In that hearing, evidence was presented showing SACS' and its counsel's self-servingly casual and myopic approach to its discovery obligations. SACS and its lawyers

unnecessarily prolonged this litigation. SACS is an entity entrusted with the fair, objective and responsible consideration of accreditation decisions which, if adverse, affect the lives of students, faculty and staff at member institutions and the viability of the institutions themselves. One would expect SACS to willingly allow the review of decisions to revoke accreditation and to cooperate in the review process, including litigation. St. Andrews claims that SACS' and its counsels' conduct materially increased its cost to litigate this case. If St. Andrews wishes the Court to address this issue, a motion must be filed by October 30, 2009.