*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0301p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

THOMAS M. COOLEY LAW SCHOOL,
　　　　　　　　　　　　*Plaintiff-Appellant,*

　　　*v.*

THE AMERICAN BAR ASSOCIATION, JOHN SEBERT,
　　　　　　　　　　　　*Defendants-Appellees.*

No. 05-1891

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 04-00221—David W. McKeague, District Judge.

Argued: March 7, 2006

Decided and Filed: August 16, 2006

Before: SILER, BATCHELDER, and GIBBONS, Circuit Judges.

---

## COUNSEL

**ARGUED:** Michael L. Cioffi, BLANK ROME, Cincinnati, Ohio, for Appellant. Anne E. Rea, SIDLEY AUSTIN, Chicago, Illinois, for Appellees. **ON BRIEF:** Michael L. Cioffi, BLANK ROME, Cincinnati, Ohio, Michael W. Hartmann, Larry J. Saylor, MILLER, CANFIELD, PADDOCK & STONE, Detroit, Michigan, for Appellant. Anne E. Rea, David T. Pritikin, Michael P. Doss, SIDLEY AUSTIN, Chicago, Illinois, for Appellees.

　　　GIBBONS, J., delivered the opinion of the court, in which SILER, J., joined. BATCHELDER, J. (p. 10), delivered a separate concurring opinion.

---

## OPINION

---

　　　JULIA SMITH GIBBONS, Circuit Judge. This case arises from a dispute between the American Bar Association, the national accrediting body for law schools and its Consultant on Legal Education John Sebert (collectively "ABA"), and the Thomas M. Cooley Law School ("Cooley" or "the school"), an accredited law school located in Lansing, Michigan. The dispute centers on Cooley's attempts to begin two satellite programs – one at Oakland University in Rochester ("Oakland campus") and one in Grand Rapids ("Grand Rapids campus"). Cooley claims that the ABA denied Cooley due process in failing to accredit the two proposed satellites and in imposing sanctions on Cooley for operating the satellites without ABA prior acquiescence. The district court denied these claims and granted judgment to the defendants. As we find that the ABA afforded Cooley all due process in making its rulings, we affirm.

1

I.

The federal government does not directly accredit institutions of higher education. Rather, the Secretary of Education approves accrediting agencies for different types of educational programs, and these accrediting bodies set independent standards for accreditation. Accreditation is important to a school for a number of reasons, not the least of which is that it allows the students of the school to receive federally-backed financial aid. In addition, the majority of states use ABA accreditation to determine whether an individual applying for admission to the Bar has satisfied the state's legal education requirement.

The ABA's Council on the Section of Legal Education ("Council") is the organization charged with accrediting law schools. The Council makes its decisions following a review and recommendation by the ABA's Accreditation Committee ("Committee"). The process is governed by written Standards, Rules, and Interpretations that are adopted after both public review and comment and review by the ABA House of Delegates ("House"). The Standards describe the requirements that a law school must meet to obtain and retain ABA approval. Standard 105 states: "Before a law school makes a major change in its program of legal education or organizational structure it shall obtain the acquiescence of the Council for the change." The opening of an additional campus falls under Standard 105. Under ABA rules, a school may offer up to 20% of its legal program at a separate campus without this being a "major change" requiring prior approval. If a school offers more than 20% of its program, however, this does constitute a major change and the ABA must grant acquiescence. Under pre-2003 ABA interpretations, any offering beyond the 20% limit was considered to be the opening of a full "branch campus" and was treated as the creation of a new law school. In December 2001, the Council proposed a new interpretation of Standard 105, which would add an intermediate "satellite campus" option. Under the new interpretation, the opening of a satellite would constitute a major change requiring ABA acquiescence but would not be subject to the same heightened review of a full branch campus. The interpretations were not officially adopted until approved by the House in February 2003.

In 2002, Cooley applied to the ABA to open a satellite at the Oakland campus. The school structured its application to be consistent with the proposed interpretations of Standard 105, despite its acknowledgment that the interpretations "remain[ed] pending" and had not been approved. Under either the old or new interpretations, Cooley's proposal constituted a major change that required ABA acquiescence. While awaiting ABA approval, Cooley began a first-year program at the Oakland campus, which did not require prior acquiescence because it constituted less than 20% of Cooley's official law program. The ABA conducted a full review of the application, including a site visit, and the findings were reported to the Committee. As the new interpretations of Standard 105 had not been approved, the Committee considered Cooley's application under the existing, more stringent requirements for a branch campus and found it lacking. The Committee summarized its findings in a report, and Cooley responded, expressing its disagreement but stating, "[W]e do not contest that acquiescence is required." The Council did not act on the Committee's recommendations and instead sent the matter back to the Committee for consideration of new information submitted by Cooley. In the interim, Cooley submitted an application for a second satellite campus, this one at Grand Rapids.

In January 2003, the Committee again considered Cooley's proposal using the existing interpretation of Standard 105 and again recommended that the application be denied. The Committee found problems with the proposal's outline of student services, library resources, full-time faculty, and facilities. The ABA also had previously expressed concern regarding Cooley's compliance with Standard 501, which mandates that law schools should only admit students who appear capable of being admitted to the Bar; the Committee felt that adding a new campus, and thus more students, would exacerbate this problem. In February 2003, the Council adopted the

Committee's recommendation and denied Cooley's application. Two days later, the House adopted the proposed interpretations of Standard 105 relating to satellite campuses.

On the day Cooley received the Council's ruling, the school informed the ABA that it was increasing its program offering at both campuses above the 20% level, despite the fact that the school had been denied acquiescence. Cooley attempted to justify this move through its reading of ABA Rule 19(d). Rule 19(d) states:

> An approved law school must inform the Consultant prior to implementing any proposed major structural change(s) so that a site evaluation visit may be promptly scheduled. In the event that the major change in organizational structure is the opening of a branch or an additional location, the site evaluation visit shall take place within six months of the start of classes at the branch or additional location.

Cooley argued that the plain language of Rule 19 dictated that an existing accredited law school must only "inform" the ABA of its decision to implement the major change of opening a branch location, so that a site visit could be scheduled "within six months of the start of classes at the branch or additional location." The school reasoned that it had informed the ABA and thus could operate for six months, allowing the ABA to make the necessary site visit.

The ABA immediately informed Cooley that its reading of Rule 19 was "erroneous" and that ABA regulations clearly required acquiescence prior to making any "major change." The letter cited Standard 105, which states: "*Before* a law school makes a major change in its program of legal education or organizational structure it *shall* obtain the acquiescence of the Council for the change." Rule 19(d), the ABA wrote, dealt only with the scheduling of site visits and provided an exception to the default ABA rule that site visits must occur within two years of approval. The ABA also cited Rule 19(a)[1] and Department of Education regulations, 34 C.F.R. § 602.22(a)(1)-(2)(vii), both of which require approval of substantive changes (including adding a location) before the change takes place. The ABA also informed Cooley that "operating either of these programs without prior acquiescence of the Council would be a violation of Standard 105 and could subject the school to sanctions." The ABA reaffirmed this position in other letters sent in February, March and August of 2003.

In October 2003, Cooley submitted applications for the opening of full branch campuses at both the Oakland and Grand Rapids locations. In November, Cooley appeared before the Committee regarding its applications. The Committee concluded that Cooley was operating satellite campuses without prior acquiescence in violation of Standard 105 and recommended that the Council not acquiesce in the proposals. The Committee also requested that Cooley appear at its next meeting in January to show cause why the school should not be sanctioned. The Council concurred both in denying the application and in asking Cooley to appear at the show-cause hearing. The Council also informed Cooley that no action would be taken on its October 2003 branch applications until the school's Oakland and Grand Rapids campuses were in compliance with the Standards.

On March 30, 2004, Cooley filed the instant lawsuit. After Cooley filed a motion for a preliminary injunction, the parties entered into a Stipulation and Agreed Order, by which Cooley agreed to reduce its offerings at Oakland and Grand Rapids to comply with the 20% limit on non-approved programs. Cooley further agreed not to expand the programs without ABA approval. The ABA agreed to move the show-cause hearing to June. Both parties complied with the Order.

---

[1]Rule 19(a) states: "A major change in the organizational structure of an approved law school raises concern about the school's continued compliance with the Standards. *Before* making a major change in its organizational structure, a provisionally or fully approved law school *shall apply for and obtain* acquiescence in the proposed change." (emphasis added).

At the June 2004 show-cause hearing, Cooley argued that the ABA did not have the authority to impose sanctions under its own rules, because the school had reduced its program offerings and was now "in compliance" with all ABA rules. The Committee disagreed and recommenced sanctions. The Council adopted the Committee's recommendation, censuring Cooley for its "substantial and persistent noncompliance" with ABA standards and directives and ruling that the school would be ineligible to operate branch or satellite campuses until July 31, 2006. The Council also declined to address the merits of Cooley's branch applications, noting its doubts about the school's ability to maintain a sound legal educational program and stating that any decision regarding opening a satellite campus in 2006 would have to be made with more current information. The Council informed Cooley that it could file a new application for a satellite or branch campus in the summer or fall of 2005.

Following this decision, Cooley filed an amended complaint, again challenging the ABA's refusal to acquiesce in its satellite programs and adding claims relating to the imposition of sanctions. Specifically, Cooley claimed that the ABA denied its common law right to due process and requested judicial review of the ABA's decision. Cooley also brought claims under the Higher Education Act ("HEA"), 20 U.S.C. § 1099b, and under state law. The district court dismissed the HEA claim and state law claims for failure to state a claim, Fed. R. Civ. P. 12(b)(6), and granted summary judgment on the common law due process claim. Cooley filed a timely appeal.

## II.

Only the common law claims are properly before this court. Cooley makes no argument regarding its state law claims except to "acknowledge[] that the district court's holding is consistent with *Foundation* [*for Interior Design Education Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 528-29 (6th Cir. 2001)], but submit[] that *Foundation* is wrongly decided for the reasons set out in Cooley's brief in the district court." This statement is not sufficient to preserve a claim of error, as a party is not allowed to incorporate by reference into its appellate brief the documents and pleadings filed in the district court. *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 452 (6th Cir. 2003); *see also United States v. Layne*, 192 F.3d 556, 566-67 (6th Cir. 1999) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Thus, Cooley has waived any argument of error pertaining to its state law claims.

Additionally, Cooley may not bring a claim under the HEA because the statute does not create a private right of action. Although this court has never addressed the question of whether the HEA creates such a right, "nearly every court to consider the issue in the last twenty-five years has determined that there is no express or implied private right of action to enforce any of the HEA's provisions." *McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1221 (11th Cir. 2002) (collecting cases); *see also College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 598 (4th Cir. 2005); *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995); *Labickas v. Ark. State Univ.*, 78 F.3d 333, 334 (8th Cir. 1996); *L'ggrke v. Benkula*, 966 F.2d 1346, 1348 (10th Cir. 1992).

Cooley acknowledges that the HEA does not expressly create a private right of action but argues that one can be inferred from § 1099b(f), which states:

> Notwithstanding any other provision of law, any civil action brought by an institution of higher education seeking accreditation from, or accredited by, an accrediting agency or association recognized by the Secretary . . . and involving the denial, withdrawal, or termination of accreditation of the institution of higher education, shall be brought in the appropriate United States district court.

This court has stated that it will "not [] infer the existence of private rights of action haphazardly." *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 421 (6th Cir. 2000). In determining whether to imply a private right of action, a court looks to four factors.

> First, we consider whether the plaintiff is one of the class for whose especial benefit the statute was enacted. Second, we examine legislative history to see if we can discern any intent either to create or to deny a right of action under the statute. Third, we weigh whether implying a right of action would be consistent with the purposes of the legislative scheme. Finally, we determine whether the cause of action is one traditionally relegated to state law, so that it would be inappropriate to infer a cause of action based solely on federal law.

*Parks School*, 51 F.3d at 1484 (citing *Cort v. Ash*, 422 U.S. 66, 78 (1975)). In examining these factors, we see no reason not to follow the holdings of our sister circuits. The HEA was passed to benefit students, not educational institutions. *See* 20 U.S.C. § 1070(a). Although educational institutions derive protections from the statute, they are not the group "for whose especial benefit the statute was enacted." Implying a private right also would be contrary to the legislative scheme, as the statute explicitly provides for enforcement through an administrative action brought by the Secretary. *See id.* § 1099b(*l*)(1). Courts should imply private rights of action only if it finds affirmative evidence that Congress intended to create such a right. *See Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001). No such evidence exists in this statute. Rather, § 1099b(f) is labeled "Jurisdiction." Its purpose is to give federal courts exclusive jurisdiction over disputes involving accreditation, like the present case. Such disputes can be resolved, not through the HEA, but through a common law claim for due process and adequate judicial review.

### III.

We thus turn to the only remaining issue – Cooley's claim that the ABA's rejection of its proposals and imposition of sanctions violated the school's common law right to due process. The district court granted summary judgment to the ABA, and we review this ruling *de novo*. *Lautermilch v. Findlay City Sch.*, 314 F.3d 271, 274 (6th Cir. 2003).

### A.

Many courts, including this one, recognize that "quasi-public" professional organizations and accrediting agencies such as the ABA have a common law duty to employ fair procedures when making decisions affecting their members. *See Foundation for Interior Design Education Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 527-28 (6th Cir. 2001); *Chicago School of Automatic Transmissions, Inc. v. Accreditation Alliance of Career Schools and Colleges*, 44 F.3d 447, 450 (7th Cir. 1994); *Wilfred Acad. of Hair & Beauty Culture v. Southern Ass'n of Colls. & Schools*, 957 F.2d 210, 214 (5th Cir. 1992); *Medical Inst. of Minnesota v. National Ass'n of Trade & Technical Schools*, 817 F.2d 1310, 1314 (8th Cir. 1987). Courts developed the right to common law due process as a check on organizations that exercise significant authority in areas of public concern such as accreditation and professional licensing. *See Majorie Webster Junior Coll., Inc. v. Middle States Ass'n of Colls. & Secondary Sch., Inc.*, 432 F.2d 650, 655-56 (D.C. Cir. 1970); *Falcone v. Middlesex County Medical Soc.*, 170 A.2d 791, 799 (N.J. 1961); *see also Foundation*, 244 F.3d at 527-28 (recognizing the development of this right). The ABA is such an organization, and we must therefore determine whether the ABA afforded Cooley adequate process in denying the applications for satellite programs and imposing sanctions.

To answer this question, we look to federal law. Although this court in *Foundation* applied state law to resolve a similar dispute, the agency in that case was not at that time approved by the Secretary of Education and thus was not subject to the HEA. Federal courts have exclusive

jurisdiction over any action brought by a school challenging an accreditation decision made by an organization approved by the Secretary (such as the ABA). 20 U.S.C. § 1099b(f). This grant of exclusive federal jurisdiction necessarily implies that federal law should govern disputes relating to decisions made by those bodies. It would make little sense for state law to govern claims that could not be heard in any state court. "It is hard enough to be a ventriloquist's dummy in diversity suits under *Erie*; it is all but impossible to see how federal courts could apply state law to the actions of accrediting agencies when state courts have been silenced by the provision for exclusive jurisdiction." *Chicago School*, 44 F.3d at 449. If a grant of federal jurisdiction can justify the creation of federal common law, *see, e.g.*, *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 456-57 (1957), a grant of exclusive jurisdiction necessarily implies the application of federal law.

We must next determine under what principles of federal law we review a decision by an accrediting agency. Both Cooley and the ABA argue that the Administrative Procedure Act ("Act"), 5 U.S.C. § 701, provides the proper framework for reviewing the accreditation process. If the decision was made directly by the Secretary of Education, the presumption would be to review the case under the principles set forth in the Act. The Secretary, however, has delegated his authority regarding law school accreditation to the ABA, which is not a government authority and thus is not governed by the Act. *Id.* §§ 701(b), 702. Despite this delegation, however, the ABA does act on behalf of the Secretary and wields the quasi-governmental power of deciding which law schools are eligible for federal funds. Thus, while the Act does not specifically apply to the ABA, principles of administrative law are useful in determining the standard by which we review the ABA's decision-making process. *See Chicago School*, 44 F.3d at 450.

A number of courts have used these principles in fashioning a standard of review. Though some of the cases applied state law, *see Foundation*, 244 F.3d at 527, and others have left the choice-of-law question unanswered, *see Wilfred Acad.*, 957 F.2d at 214; *Medical Institute of Minnesota*, 817 F.2d at 1314-15, courts have uniformly looked to administrative law in reviewing accreditation decisions. We agree and apply the standard of review that has developed in the common law. This court reviews only whether the decision of an accrediting agency such as the ABA is arbitrary and unreasonable or an abuse of discretion and whether the decision is based on substantial evidence. *See Foundation*, 244 F.3d at 529; *Chicago School*, 44 F.3d at 449.

This standard of review resembles the review applied under the Act. *See* 5 U.S.C. § 706(2)(A) ("arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law"). We emphasize, however, that while principles of federal administrative law provide guidance in our analysis, judicial review of accreditation decisions is more limited than review under the Act. Although accrediting agencies perform a quasi-governmental function, they are still private organizations. Courts have made the policy decision to ensure that these organizations act in the public interest and do not abuse their power, but judicial review is limited to protecting the public interest. Recognizing that "the standards of accreditation are not guides for the layman but for professionals in the field of education," *Wilfred Acad.*, 957 F.2d at 214 (quoting *Parsons College v. North Cent. Ass'n of Colleges & Secondary Sch.*, 271 F. Supp. 65, 73 (N.D. Ill. 1967)), great deference should be afforded the substantive rules of these bodies and courts should focus on whether an accrediting agency such as the ABA followed a fair procedure in reaching its conclusions. We are not free to conduct a *de novo* review or substitute our judgment for that of the ABA or its Council. Rather, in analyzing whether the ABA abused its discretion or reached a decision that was arbitrary or unreasonable, we focus on whether the agency "conform[ed] its actions to fundamental principles of fairness." *Medical Institute of Minnesota*, 817 F.2d at 1314.

B.

Cooley argues that the ABA abused its discretion in refusing to consider the merits of its satellite application at the 2004 hearing and in imposing sanctions in violation of the ABA's own

rules.  Cooley also alleges that a number of due process violations occurred during the three rounds of hearings in 2002-2004.

*1.  Imposition of Sanctions*

Cooley makes two arguments regarding the ABA's decision to impose sanctions that prevented Cooley from operating a satellite or branch campus until July 31, 2006.  First, Cooley argues that the ABA abused its discretion by sanctioning the school in violation of its own rules.  Second, Cooley alleges that the sanction was arbitrary and unreasonable and violated due process.  An abuse of discretion can only be found if no evidence supports the decision or if the agency misapplied the law.  *National Engineering & Contracting Co. v. OSHA*, 928 F.2d 762, 768 (6th Cir. 1991).

Cooley argues that the plain language of ABA Rule 13, which outlines hearings on show-cause orders, prohibited the Council from imposing sanctions because, at the time of the hearing, Cooley was in compliance with all ABA governing standards.  Rule 13 states in relevant part:

> (b) Representatives of the law school, including legal counsel, may appear at the hearing and submit information to demonstrate that the school is currently in compliance with all the Standards or to present a reliable plan for bringing the school into compliance with all of the Standards within a reasonable time.
> (d) After the hearing, the Committee shall determine whether the law school is in compliance with the Standards and, if not, it shall direct the law school to take remedial action or shall impose sanctions as appropriate.
>> (1) . . .
>> (2) If matters of noncompliance are substantial or have been persistent, then the Committee may recommend to the Council that the school be subjected to sanctions other than removal from the list of approved law schools regardless of whether the school has presented a reliable plan for bringing the school into compliance.
>> (3) . . .
> (e) If the Committee determines that the law school is in compliance, it shall conclude the matter by adopting an appropriate resolution . . . .

Cooley reads these subsections as stating that the purpose of the show-cause hearing is not to determine whether the school has previously violated ABA rules, but rather to determine whether the school "is currently in compliance" with the Standards.  Regardless of its previous actions, Cooley argues it had reduced its course offerings below the 20% level at the time of the show-cause hearing; thus, it was "currently in compliance" and the ABA should have "conclude[d] the matter."  By not doing so, Cooley contends, the ABA failed to follow the plain language of its own rules, and thus, the decision is not entitled to deference.

We agree with the ABA that Rule 13 cannot be given such a literal interpretation.  Subsections (d) and (e) must be read in conjunction with the remainder of Rule 13, as well as other ABA rules.  While not dispositive, subsection (d)(2) has a clear focus on past violations that "have been persistent."  More importantly, Rule 11(b), which determines when a school can be called to a show-cause hearing, does not require current noncompliance:

> If, upon a review of the information furnished by the law school in response to the Committee's request and other relevant information, the Committee determines that the school *has not demonstrated compliance* with the Standards, the school may be required to appear at a [show-cause] hearing . . . (emphasis added).

The language of this rule exposes the fallacy of Cooley's argument. Under Rule 11, the ABA can require a school that "has not demonstrated compliance" to show cause as to why it should not be sanctioned, regardless of whether the school is currently in compliance with the Standards. It would make little sense for the ABA to require a currently-compliant school to make such a showing if it had no power to sanction that school.

Cooley's interpretation of Rule 13 would also allow schools to come in and out of compliance to avoid sanctions. In this case, the school remained in compliance through the February 2003 acquiescence decision, at which time it increased its course offerings and went out of compliance. Following the Agreed Order and in advance of the June 2004 show-cause hearing, the school quickly reduced its course offerings and came back into compliance. Cooley's actions demonstrate the danger of its reading of Rule 13, which would render the ABA powerless to sanction such blatant disregard of its rules and standards. This court must defer to an agency's interpretation of its own rules unless plainly erroneous. *See A.D. Transport Express, Inc. v. United States*, 290 F.3d 761, 766 (6th Cir. 2002). While Cooley's proposed interpretation of Rule 13 is perhaps plausible, the ABA's reading is not clearly erroneous and in fact is more logical. Thus, the ABA's imposition of sanctions despite Cooley's compliance with ABA standards at the time of the hearing does not constitute an abuse of discretion.

Cooley also argues that the sanction itself was arbitrary and unreasonable and violated due process. An agency sanction, though, "if within the bounds of its lawful authority, is subject to very limited judicial review," and "the severity of the sanction is not open to review." *Goldstein v. United States*, 9 F.3d 521, 523 (6th Cir. 1993) (citation and internal quotation marks omitted); *see also Cobb v. Yeutter*, 889 F.2d 727, 730 (6th Cir. 1989) ("We review only to ensure that the chosen penalty is an allowable judgment under the law and the facts.") (citations omitted). In this case, the basis for the sanctioning decision was well-known and well-supported by the evidence. Cooley does not dispute in this court its noncompliance during the February 2003 through April 2004 period. The Committee's report, which was adopted by the Council, carefully details the relevant findings and rationales supporting the sanction. Even though the sanction may have had significant impact on Cooley, it cannot be described as arbitrary and unreasonable, especially given the highly deferential standard of review and the evidence of Cooley's blatant and intentional noncompliance with ABA rules.

*2. The Acquiescence and Sanctioning Hearings*

Cooley next contends that the district court erred in failing to address its claims that the ABA abused its discretion in denying the satellite applications in 2002 and 2003, before the school's noncompliance. The district court did, however, address these claims, and in any case, they are meritless. Cooley was afforded ample process at each of the ABA hearings – it was notified well in advance, afforded the opportunity to submit evidence to supports its case, and permitted to appear before the body with counsel present. After each group of hearings, the Committee issued a detailed written report outlining its findings and recommendations. The Council in turn wrote a letter outlining its conclusions, referencing the findings of the Committee and the applicable rules and standards.

Cooley's claim that the ABA erred in not using the new interpretations of Standard 105 in the December 2002 and January 2003 evaluations of the school's satellite applications, when those interpretations were not officially adopted until February 2003, is equally baseless. We refuse to hold that an accrediting agency abuses its discretion by following its existing regulations, rather than ones that are proposed but not yet adopted. Such a ruling would turn rulemaking on its head and leave accrediting agencies vulnerable to attack anytime a rule change was in process. The other errors alleged by Cooley – a conflict of interest by one Committee member and the use of an incorrect fact sheet during one of the hearings – do not amount to a due process violation. The

supposed conflict of interest arose because one Committee member was the dean of another law school. After considering the matter, the Committee denied the request that the member be replaced, finding no danger of bias and reasoning that Cooley's logic would disqualify almost any member of the Committee. As to the incorrect fact sheet, it was quickly corrected and there is no evidence that the Committee relied on it in reaching its conclusion. As both of these claims of error were duly considered by the ABA and rejected with sufficient reasoning, they do not constitute an abuse of discretion and do not in any way violate Cooley's right to a fair process.

Cooley also argues that the Council abused its discretion in declining to act on its satellite campus applications at the June 2004 hearing. The Council was well within its discretion not to rule on the merits of the applications, as the imposition of sanctions meant that the satellites would not open until 2006, and thus, the Council did not have sufficient information on which to base its decision. The delay allowed the Committee to conduct an additional site visit in the summer of 2005, giving the ABA the most up-to-date information on which to base the accreditation decision. Cooley has not argued that the decision to delay contradicted ABA rules or established policies. In fact, the focus of Rule 19(d) is to ensure that the ABA makes decisions on satellite and branch campuses based on current information. The decision to delay ruling on the satellite applications did not constitute an abuse of discretion.

Finally, Cooley raises a number of alleged procedural problems with the sanctions hearing: the denial of its request to cross-examine witnesses, the combined prosecutorial and adjudicative functions, and the possible introduction of *ex parte* evidence. As the district court correctly noted, these allegations "do not even hint at the existence of prejudicial error" that would be needed to justify relief. "[A] mistake that has no bearing on the ultimate decision or causes no prejudice shall not be the basis for reversing an agency's determination." *Coalition for Gov't Procurement v. Fed. Prison Ind., Inc.*, 365 F.3d 435, 468 (6th Cir. 2004). In light of the undisputed evidence of substantial and persistent noncompliance, Cooley cannot show that it would not have been sanctioned had these alleged errors not occurred.

IV.

For the foregoing reasons, the decision of the district court is affirmed.

---

**CONCURRENCE**

---

ALICE M. BATCHELDER, Circuit Judge. I concur in the court's opinion. I write separately because although my point of disagreement does not affect the outcome of this case, I disagree with the majority's interpretation of ABA Rule of Procedure 13(d). Both the plain language and the structure of the rule make plain that the ABA could not sanction Cooley unless Cooley was not in compliance with the ABA Standards at the time of the show cause hearing. At the time of the hearing, the rule, by its plain language, instructed the Committee to determine "whether the law school *is* in compliance with the Standards . . . ." ABA R. PROC. 13(d) (emphasis added). If so, Rule 13(e) directed the Committee to "conclude the matter by adopting the appropriate resolution . . . ." If not, Rule 13(d) required the Committee to "direct the law school to take remedial action" or "impose sanctions." The ABA's use of "is" in the flush language of Rule 13(d) required it to make a present-tense determination of compliance. Therefore, the latter courses of action were permitted only if the Committee found that the school was not in compliance at the time of the hearing. In my view any other interpretation of the rule turns grammar on its head.

That the rule required a determination of compliance at the time of the hearing is evident not only from its plain language, but also from its structure. The subsections of Rule 13(d) that penalize persistent noncompliance were available only upon an initial finding of current noncompliance as required by the flush language of the rule. Furthermore, Rule 14, which described the Council's consideration of sanctions at the time of Cooley's hearing, clearly contemplated that sanctions would apply only to schools that were not currently in compliance. Rule 14(a) provided that the Council "may direct the law school to take remedial action or subject it to sanctions . . . regardless of whether the school has presented a reliable plan for bringing the school into compliance . . . ." Rule 14(c) next provided that, if the Council imposed sanctions on a school that had no remedial plan, the "Committee shall monitor the steps taken by the school to come into compliance." By its plain language, then, the rules contemplated sanctions for only two types of schools: those that were not in compliance but had a remedial plan, and those that were not in compliance and had no such plan. If, as Cooley alleges, it was in compliance at the time of the hearing, it fell into neither category and sanctions were inappropriate.

Finally, Rule 14's focus on compliance makes clear that the ABA intended sanctions to be remedial, not punitive, in nature. Accordingly, Rule 14's final section provided that "[a]t any time that the school presents information on which the Committee concludes that the school is in full compliance with the Standards, the Committee shall recommend to the Council that the school be taken off probation." ABA R. PROC. 14(d). When read in light of Rule 14, the already clear instructions of Rule 13 become inescapable. Under Rule 13(d), the Council was not permitted to sanction Cooley unless Cooley was not in compliance with ABA standards at the time of the show cause hearing.