Filed 7/22/15  Breining Institute v. Institute for Credentialing Excellence CA3

<u>NOT</u> <u>TO</u> <u>BE</u> PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| BREINING INSTITUTE,<br><br>             Plaintiff and Appellant,<br><br>      v.<br><br>INSTITUTE FOR CREDENTIALING EXCELLENCE,<br><br>             Defendant and Respondent. | C077059<br><br>(Super. Ct. No. 34-2013-80001434-CU-WM-GDS) |

Breining Institute (Breining) is one of 10 organizations approved by the California Department of Alcohol and Drug Programs to register and certify alcohol and other drug abuse counselors in California.  (Cal. Code Regs., tit. 9, § 13035(a)(1).)  In turn, it must be accredited by the National Commission for Certifying Agencies (NCCA).  (*Id*., § 13035(c)(2).)  NCCA is a standing committee of Institute for Credentialing Excellence that provides accreditation for a variety of certification programs.

1

NCCA initially accredited Breining in 2006; an accreditation is good for five years.  NCCA denied Breining's application to renew its accreditation in 2012, and then upheld that denial on administrative appeal.  Breining filed a petition for a writ of administrative mandate (Code Civ. Proc., § 1094.5), seeking an order directing NCCA to vacate its decision denying Breining's application for renewal of its accreditation and to consider the renewal application through a fair process.  Breining obtained a stay of the denial of the accreditation renewal.  In April 2013, while the writ petition was pending, Breining filed a new application for accreditation renewal.  After NCCA refused to consider the 2013 application, Breining filed a supplemental writ petition, seeking an order directing NCCA to consider it.  The trial court denied the petition, as amended and supplemented to apply to both the 2012 and 2013 applications.

On appeal, Breining challenges the denial of both its 2012 and 2013 applications for renewal of accreditation, contending it was denied fair process.  As to the 2012 renewal application, Breining contends NCCA failed to apply its policy for correcting errors in accreditation review because Breining was not given an opportunity to cure the problems cited in the denial of the renewal application.  It adds that the trial court erred in accepting NCCA's interpretation that the policy did not apply to renewal applications.  As to the refusal to consider the 2013 renewal application, Breining contends the trial court overlooked a multitude of errors:  (1) failure to follow NCCA's rules for application; (2) biased decision-makers; (3) lack of a rational basis for the refusal; (4) estoppel; (5) retaliation; and (6) prejudice to Breining.  Breining also contends NCCA's counsel had an improper dual role as advocate and advisor.

While recognizing Breining's right to fair process, we are also cognizant of "the principle that the judiciary should generally accede to any interpretation by an independent voluntary organization of its own rules which is not unreasonable or arbitrary.  [Citation.]"  (*California Trial Lawyers Assn. v. Superior Court* (1986) 187 Cal.App.3d 575, 580 (*California Trial Lawyers*).  We find that NCCA's interpretation of

2

the correcting errors policy was reasonable.  We further find that NCCA had a rational reason for declining to consider Breining's 2013 renewal application while litigation over the review process applied to the 2012 application was pending, and Breining has failed to establish bias, estoppel, retaliation, or counsel's improper dual role.  Accordingly, we shall affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

*NCCA Accreditation*

California regulates those providing counseling services in alcohol and other drug (AOD) programs, as well as those certifying AOD counselors and AOD programs.  (Cal. Code Regs, tit. 9, § 13000.)  To certify AOD counselors, an organization must be accredited by NCCA.  (*Id.*, § 13035(b)(2).)

Institute for Credentialing Excellence provides standards for accreditation of professional personnel certifications.  Its standing committee, NCCA, provides accreditation for a variety of personnel certification programs that assess professional competence.  NCCA bases accreditation on compliance with 21 standards.  The standards are organized into five sections:  (1) purpose, governance, and resources (1-5); (2) responsibilities to stakeholders (6-9); (3) assessment instruments (10-18); recertification (19-20); and (5) maintaining accreditation (21).

The core of a certification program is the test or other assessment instrument designed to measure competency.  Psychometrics is the field of study concerned with construction and validation of measurement instruments such as tests.  NCCA has at least nine voting commissioners, two of whom are psychometricians.

NCCA has a Policy and Procedure Manual (the Manual) which sets forth the basic rules and procedures for accreditation review.  Accreditation is for a five-year period.  Renewal of accreditation requires a completely new application; review is conducted de novo without consideration of the original accreditation.  Each application is given to all NCCA commissioners.  Two commissioners perform an in-depth review; one focuses on

3

the administrative standards (1-9, 16-21) and the other on the psychometric standards (10-15).

At issue in this case are four NCCA standards: 2, 3, 10, and 11. Standards 2 and 3 relate to governance. Standard 2 requires the certification program to be structured and governed in a way to ensure autonomy in decision making. Standard 3 requires the certification board or governing committee have a public member. Standard 10 relates to the assessment instrument and requires a link between the job/practice analysis and the assessment instrument. For substance abuse counselors, the job/practice analysis is set forth in TAP 21. TAP 21 is a technical assistance publication of the U.S. Department of Health and Human Services on addiction counseling competencies. TAP 21 provides "a comprehensive list of 123 competencies that substance abuse counselors should master to do their work effectively." Standard 11 requires that the assessment instrument be consistent with generally accepted psychometric principles.

*Breining's 2006 Accreditation*

Breining is a corporation that provides college and continuing education courses in substance abuse addiction. In 2006, Breining submitted an amended application to NCCA for accreditation of its Registered Addiction Specialist (RAS) program. NCCA requested additional information regarding four different standards relating to both the governing structure of Breining (2 & 3) and the examination (10 & 11). After Breining responded, NCCA granted accreditation of Breining's RAS program for a period of five years, through July 31, 2011. As required, Breining submitted annual reports to NCCA for 2006 through 2010. These reports indicated there were no substantive changes to Breining or the RAS program.

*2010 Application for Renewal of Accreditation*

In 2010, Breining submitted a renewal application, stating, "There have been no substantive changes to our RAS certification program since we were first accredited by

4

NCCA in 2006." NCCA deferred a decision on the application, requesting further information on a number of issues.

After receiving responses, NCCA considered Breining's application for renewal of accreditation of its RAS program and decided to defer it on standards 2, 3, 10, and 11, pending full legal review. Subsequently, NCCA voted to deny renewal based on psychometric issues and standards 10 and 11; Breining had not demonstrated a link between the TAP 21 competencies and the RAS exam. A motion to deny renewal due to noncompliance with standards 2 and 3, relating to governance and avoiding undue influence, was defeated.

NCCA agreed to reconsider the renewal application and Breining provided additional information about the RAS examination, compiled with the assistance of a psychometric expert. NCCA determined this additional information was insufficient and voted unanimously to deny the renewal application. A motion to deny reconsideration passed unanimously. While an appeal hearing was pending, Breining offered to have NCCA's psychometrician speak with Breining's psychometric expert. Breining provided additional information to NCCA, but such information was not accepted because due to the appeal, the record was closed. Eventually, after considerable correspondence, the parties agreed Breining could submit a new application for renewal of accreditation.[1]

*2012 Application for Renewal of Accreditation*

In September 2012, Breining submitted to NCCA an updated renewal application. The NCCA commissioners agreed the psychometric documentation (standards 10 & 11) was incomplete and requested additional information. After review of additional reports submitted by Breining, NCCA voted unanimously to deny the application.

---

[1] NCCA claims this opportunity to submit a new application was "unprecedented." (AA 364, 368, 561)

By letter dated December 5, 2012, NCCA notified Breining that the denial was based on failure to demonstrate compliance with four standards. Breining failed to comply with standard 2 because the majority of the RAS Certification Board was comprised of Breining's instructors and administrators, creating a conflict of interest. There was no compliance with the requirement there be an involved public member under standard 3 because the listed public member had never participated in any activities of the RAS Certification Board. Breining failed to demonstrate compliance with standard 10 because its job analysis process was based on the judgment of the 14-member panel of subject matter experts (SME) and most of the SMEs were affiliated with Breining as faculty or administrators. "Given the lack of independence between the education and certification roles of many of these committee members, the validity of the job analysis process, results, and decisions is doubtful. . . . [T]his substantive deficiency impacts subsequent test development and validation activities, and does not meet the requirements of Standard 10." Finally, because many of those involved in developing the examination were also involved in the education function, standard 11 was violated.

NCCA unanimously denied Breining's request for reconsideration.

Breining's request for an appeal was granted. The appeal was held before a panel of three, none of whom were current members of NCCA. At the appeal hearing, NCCA's primary psychometric reviewer noted that a lack of linkage between TAP 21 and the certification exam had been a problem since 2006. He testified that NCCA could not have raised the conflict of interest problem before because it did not know about it. Breining had been given deferrals to correct the linkage problem, but NCCA never received sufficient evidence of linkage. Now the concern was the involvement of Breining faculty in establishing the job analysis. He noted that TAP 21 has 123 competencies, but 80 percent of Breining's exam represented only 20 percent of those. As to the public member requirement of standard 3, the public member had admitted he had never attended a meeting, and indeed there had been no meetings, contrary to the

6

spirit and letter of standards 2 and 4. NCCA considered the RAS Certification Board only a shell; it never functioned or acted in the public interest. "This situation makes a mockery of our standards." The appeal hearing panel upheld the denial of the Breining's application for re-accreditation.

*Petition for Writ of Mandate and Stay*

Breining filed a petition for a writ of mandate. Breining claimed it was denied fair process both in NCCA's review of the application and in the subsequent appeal. It claimed NCCA failed to comply with its own rules, adding that during the appeal Breining was unable to examine certain records and one member of the appeals panel was not impartial. Breining sought an order directing NCCA to vacate its decision denying Breining's renewal application and to reconsider the application "through a fair process as set forth by the Court including, but not limited to, proceeding in a manner consistent with the plain meaning of . . . NCCA's published standards and procedures." Breining also sought a stay of the denial of its accreditation renewal.

NCCA opposed the stay. It argued there was no irreparable harm to Breining because it could "reapply for accreditation as soon as the program is prepared to demonstrate its full compliance with the *Standards*." At the hearing on the stay, NCCA repeated its argument that there was no harm to Breining because it could reapply at any time. The court asked how long it would take to act on the application if Breining reapplied tomorrow, and counsel for NCCA replied it could be as little as two months if the application was sufficient on its face. NCCA also argued Breining was unlikely to succeed on the merits. The court granted the stay.

*2013 Application and Supplemental Writ Petition*

In April 2013, Breining submitted a new application for renewal of accreditation. The accompanying cover letter noted the primary change in the application concerned the composition of the governing board of the RAS Certification program. All but one individual with any involvement with Breining's education function had been removed

7

from the board, a new public member was appointed, and there was a commitment to holding meetings at least once a year.

NCCA refused to entertain Breining's new application while the lawsuit challenging denial of the 2012 application was pending.  Further, NCCA's counsel advised Breining that this decision was not subject to appeal.

Breining then filed an amended and supplemental petition for a writ of mandate. The supplemental portion of the petition addressed the refusal to consider the new 2013 application.  Breining sought an order directing NCCA to vacate its 2013 decision and to consider the 2013 renewal application on the merits through a fair process.

*NCCA's Motion to Lift Stay*

In response to Breining's new application for accreditation renewal, NCCA moved to lift the stay of its denial of the previous application.  NCCA argued that the status quo had been altered by Breining's filing a new application.  It argued the original petition was now moot, thereby nullifying the basis for the stay.

The court denied the motion to lift the stay, finding no material change in the factors upon which the stay was based and that the 2013 application did not moot the parties' controversy.

*Ruling on Writ Petition and Judgment*

The trial court ruled in favor of NCCA as to both the 2012 and 2013 applications. It denied the amended and supplemental writ petition in its entirety.  The court granted Breining's ex parte application to extend the stay until the time for filing an appeal.

Breining appealed.  We denied Breining's motion to further extend the stay.[2]

_____

[2] Although Breining has now lost its NCCA accreditation, it contends the appeal is not moot because a reversal would allow it to pursue compensatory damages for loss of business and it would give Breining the opportunity to resume certification through a new renewal hearing.

8

# DISCUSSION

## I

### *Requirement of Fair Process*

Membership associations, such as medical societies, that serve a quasi-public function are subject to the common law fair process that requires their decisions be both substantively rational and procedurally fair. (See 9 Witkin, Summary of California Law (10th ed. 2005) Corporations, §§ 44-45, pp. 820-822.) The California Supreme Court set forth the requirements of fair process in *Pinsker v. Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, at pages 555 and 556 (*Pinsker*): "We thus recognize that a basic ingredient of the 'fair procedure' required under the common law is that an individual who will be adversely affected by a decision be afforded some meaningful opportunity to be heard in his defense. Every one of the numerous common law precedents in the area establishes that this element is indispensable to a fair procedure. [Citations.] [¶] The common law requirement of a fair procedure does not compel formal proceedings with all the embellishments of a court trial [citation], nor adherence to a single mode of process. It may be satisfied by any one of a variety of procedures which afford a fair opportunity for an applicant to present his position. As such, this court should not attempt to fix a rigid procedure that must invariably be observed. Instead, the associations themselves should retain the initial and primary responsibility for devising a method which provides an applicant adequate notice of the 'charges' against him and a reasonable opportunity to respond. In drafting such procedure, and determining, for example, whether an applicant is to be given an opportunity to respond in writing or by personal appearance, the organization should consider the nature of the tendered issue and should fashion its procedure to insure a *fair* opportunity for an applicant to present his position. Although the association retains discretion in formalizing such procedures, the courts remain available to afford relief in the event of the abuse of such discretion."

9

Federal courts have applied the federal counterpart to fair process--common law due process--to the decisions of accrediting agencies. (*Thomas M. Cooley Law School v. American Bar Ass'n* (6th Cir. 2006) 459 F.3d 705, 711 (*Cooley*) ["Many courts, including this one, recognize that 'quasi-public' professional organizations and accrediting agencies such as the ABA have a common law duty to employ fair procedures when making decisions affecting their members"].) "Courts developed the right to common law due process as a check on organizations that exercise significant authority in areas of public concern such as accreditation and professional licensing. [Citations.]" (*Id.* at p. 712.)

"Whether a fair procedure claim is brought pursuant to federal or California law, the legal analysis a court performs is nearly identical. In assessing a federal fair procedure claim, courts review 'only whether the decision of an accrediting agency such as the ABA is arbitrary and unreasonable or an abuse of discretion and whether the decision is based on substantial evidence.' [Quoting *Cooley*.] Similarly, under California law, 'an organization's decision to expel or exclude an individual may be arbitrary either because the reason underlying the rejection is irrational or because the organization has proceeded in an unfair manner. . . . [Quoting *Pinsker*.]" (*Whittier College v. ABA* (C.D. Cal., May 7, 2007) 2007 U.S. Dist. LEXIS 43707, at *20.)[3]

II

*Denial of 2012 Application*

Breining contends NCCA failed to provide fair process as to the 2012 application because it failed to follow it own procedure. Specifically, Breining contends NCCA failed to follow its policy for correcting errors in accreditation review by failing to give Breining an opportunity to cure its conflict of interest and public member problems.

---

[3] California Rules of Court do not prohibit citation to unpublished federal cases, which may be properly cited as persuasive authority. (*Landmark Screens, LLC v. Morgan, Lewis & Bockius, LLP* (2010) 183 Cal.App.4th 238, 251, fn. 6.)

A. *Standard of Review*

Our review of NCCA's decision on the 2012 application, like that of the superior court, is governed by Code of Civil Procedure section 1094.5. (See *Anton v. San Antonio Community Hosp.* (1977) 19 Cal.3d 802, 815-820 [recognizing that administrative mandamus procedure applies to non-governmental agencies].) We determine "whether there was a fair trial," and "whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b).) "Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*) A failure to proceed in the manner required by law is a prejudicial abuse of discretion and warrants relief only where "the deviation is material." (*El–Attar v. Hollywood Presbyterian Medical Center* (2013) 56 Cal.4th 976, 991.)

B. *NCCA's Policy for Correcting Errors*

NCCA's Manual governs the accreditation review process. One part of that Manual addresses errors in accreditation review. That provision provides in part: "Due regard for the public mission and integrity of the NCCA requires that the Commission act to correct later-discovered errors of material fact or judgment in accreditation decisions. Except in extraordinary cases, however, corrective action will be taken only after the affected certification program is given notice and an opportunity to cure the defective activity, i.e., the program must demonstrate current compliance with the applicable standard or face adverse consequences such as loss of accreditation or denial of renewal."

The policy for correcting errors provides that when a commissioner or staff member believes an error has occurred, the matter is to be brought promptly to the chair of the commission. The following procedure is then followed. First, the chair makes a preliminary assessment as to whether the new evidence would have materially affected the accreditation decision. If not, the matter concludes. If so, the chair reports the new evidence to the full commission with recommendations for corrective action. The

11

commission notifies the program and sets a time limit for demonstrating compliance. An accreditation will not be revoked for an alleged error that is discovered more than three years after the accreditation decision. The program may appeal any adverse consequence.

Another provision in the Manual addresses accreditation renewal and provides: "The Commission reserves the right to deny renewal of accreditation based upon the non-compliance with any Standard including non-compliance that was not detected with the initial application, non-compliance with any new standards, or non-compliance based on current interpretation of the Standards."

C. *Analysis*

Breining argues that since its structure and governance was unchanged from 2006 when it first obtained accreditation, the conflict of interest problems later identified by NCCA were errors in granting the original accreditation. Because these issues were later discovered, Breining argues, the correcting errors policy was applicable. Thus Breining was entitled to an opportunity to cure its governance problems before its 2012 application could be denied.

NCCA points to the portion of that policy restricting its application to the three years after an accreditation; it argues that thereafter, as in Breining's situation, any problems are properly addressed as part of the renewal process. NCCA emphasizes the repeated opportunities afforded Breining to cure deficiencies in its test, specifically the linkage problem, through deferrals, requests for additional information, and the unprecedented step of permitting Breining to file a new renewal application in 2012 after its 2010 application was found unsatisfactory.

These contrary positions bring into focus a key disagreement between the parties: the exact basis of the 2012 denial. Breining contends NCCA changed its reason for denying the renewal application from linkage problems with the test to governance problems; namely, conflict of interest and a nonexistent public member. NCCA argues it

12

did not *change* reasons, but only *added* reasons as it discovered the conflict of interest and public member problems. NCCA's December 2012 letter of denial, however, as summarized *ante*, was limited to the problems arising from the lack of independence between Breining's educational and the certification functions. While the letter cited failure to comply with standards 10 and 11, which relate to the test, the problem was described as follows: "Given the lack of independence between the education and certification roles of many of these committee members, the validity of the job analysis process, results, and decisions is doubtful. . . . [T]his substantive deficiency impacts subsequent test development and validation activities, and does not meet the requirements of Standard 10." Further, standard 11 was violated because many of those involved in developing the examination were also involved in the education function. Thus, Breining is correct that the denial was based on governance issues, not deficiencies in the test as to linkage with TAP 21, as previously identified.[4] Accordingly, Breining's many opportunities to cure the test linkage problems are irrelevant to the issue before us. It is undisputed that Breining was not given an opportunity to cure the governance problems cited in the December 2012 denial letter before NCCA denied the application. The trial court described the cure as simply "putting different people in certain positions." The issue, therefore, is whether a reasonable interpretation of the NCCA Manual, in its entirety, required that Breining be afforded an opportunity to cure the governance problems before its 2012 application for renewal of accreditation was denied.

---

[4] At the appeals hearing, NCCA's psychometric reviewer testified to the unresolved linkage problems. At the hearing on the stay, an attorney for NCCA argued there were more reasons for denial than just the conflict of interest and public member issues; there were grounds that went to the substance of the test. General Counsel for NCCA, however, stated "it is fair to say that there are two basic grounds for the decision to deny accreditation." He identified those grounds as conflict of interest and the public member.

13

The significance of whether Breining is entitled to an opportunity to cure the areas of noncompliance or must fix the problems and then submit a new application for accreditation is the *status of its accreditation* during the time it takes to fix the problems. If there is an opportunity to cure before accreditation lapses, Breining can possibly keep its accreditation in place. In NCCA's view, Breining's accreditation should have lapsed long ago, as Breining continues to be woefully unable to demonstrate compliance with the NCCA Standards.

To determine whether Breining should have received an opportunity to cure, we turn to the language of NCCA's Manual. In construing the governing documents of private voluntary organizations, we defer to the organization's interpretation, but we are not bound by any unreasonable construction of plain and unambiguous language. (*California Dental Assn. v. American Dental Assn.* (1979) 23 Cal.3d 346, 354 (*Cal. Dental*).) Courts are reluctant to intervene in private controversies and that reluctance "is premised on the principle that the judiciary should generally accede to any interpretation by an independent voluntary organization of its own rules which is not unreasonable or arbitrary. [Citation.]" (*California Trial Lawyers, supra,* 187 Cal.App.3d at p. 580.) We conclude that a reasonable interpretation of NCCA's Manual does not provide Breining an opportunity to cure before denial of its 2012 renewal application.

The correcting errors policy is concerned with errors made by NCCA in its prior accreditation decisions. "This policy addresses errors discovered after an accreditation has become final." It looks backwards to determine if newly discovered evidence "would have materially affected the outcome of a prior accreditation decision." The policy is concerned with whether a *prior* decision was "predicated upon errors of fact or judgment." Revisiting the prior decision can have harsh consequences because the accredited program has relied on that decision in conducting its business. The harshness is ameliorated in two ways. First, the possibility of revoking the prior accreditation is limited to the first three years. Second, there is an opportunity to cure. Where, like here,

14

the institution is not relying on a prior decision of the NCCA, because no renewal decision has yet been made, the situation is vastly different. The NCCA Manual provides that a renewal begins anew, with a review of the entire application, and the burden is on the applicant to show full compliance with NCCA Standards. At renewal, NCCA "reserves the right to deny renewal of accreditation based upon non-compliance with any Standard including non-compliance that was not detected with the initial application . . . ." Further, the Manual indicates that a "mechanism to correct contemporaneous errors exists in the Commission's procedures for appeal of adverse accreditation decisions."

Breining argues that the cure provision of the correcting errors policy applies to renewals because the policy includes "denial of renewal" as a possible adverse consequence of failure to cure. That provision, however, could simply mean that if the cure period extends until the time of renewal, such that loss of the prior accreditation is rendered meaningless, the adverse consequence for failure to demonstrate compliance is denial of renewal. Denial of renewal can be based on "non-compliance that was not detected with the initial application."

At best for Breining, the language of the Manual is ambiguous, as the trial court found. In such situations, we defer to NCCA's reasonable interpretation. As we have explained, NCCA's interpretation is *not* an unreasonable construction, and it certainly does not misinterpret plain and unambiguous language. (*Cal. Dental, supra,* 23 Cal.3d at p. 354.) As our Supreme Court has instructed, we must not unduly interfere with NCCA's autonomy by substituting our judgment in an area--accreditation--where our experience is not equal to that of NCCA. (See *ibid.*)

NCCA did not deny Breining fair process in the denial of the 2012 renewal application by failing to apply the cure provision of the correcting errors policy.

## III

### *Denial of 2013 Application*

Breining contends NCCA denied it fair process when it refused to consider Breining's 2013 application while litigation over the 2012 application was pending. Breining specifically contends that: NCCA failed to follow its review procedure; those who made the refusal decision were biased; the refusal lacked a rational basis; estoppel precluded the refusal; the refusal was retaliation; and Breining was prejudiced by the refusal.

NCCA answers that we need not consider these claims. It asserts that even if we were to reverse as to failure to consider the 2013 application, the remedy would simply be NCCA's review of Breining's (new) application. NCCA contends that same remedy is available to Breining upon termination of this litigation, regardless of the result.

Breining responds that resolving the issues involving the 2013 refusal will have an impact. First, given the length of time it has gone without accreditation, Breining may decide to no longer seek NCCA accreditation but instead pursue only damage claims. The nature of these claims will depend on the grounds for the reversal, especially if we find retaliation. Second, if we reverse, NCCA's review of Breining's application will be more "constrained" as our opinion may set forth certain parameters of that process. Third, if we reverse, the subsequent review will occur under the jurisdiction of the superior court pursuant to a writ of mandate.

Somewhat ironically, Breining has refuted its own arguments by providing reasons why NCCA acted reasonably in deferring review until the pending ligation was complete. The rationale supporting its second and third points applies equally to NCCA's decision not to review the 2013 application until the litigation involving the 2012 application is complete. The resolution of the issues in the litigation over the 2012 application could affect the review of Breining's 2013 application, both by constraining that review and by placing it under jurisdiction of a court. This is especially true since the writ petition

16

raised more alleged defects in the process than the sole issue raised on appeal--the application of the correcting errors policy. Breining tries to have it both ways on the importance of judicial guidance for review of the 2013 application. On the one hand, it demands review of NCCA's decision to defer review of the 2013 application because it will provide judicial guidance for further review. But, on the other hand, Breining dismisses as unreasonable NCCA's deferring review of the 2013 application until it obtained guidance from judicial review of the 2012 application before engaging in further review. With Breining's untenable inconsistency in mind, we turn to its specific objections to the decision to refuse to review the 2013 application until the pending litigation was resolved.

A. *Failure to Follow NCCA's Own Procedure*

Breining contends NCCA failed to follow its own procedure for reviewing applications for accreditation when it refused to review Breining's 2013 application. Breining, however, does not point to any rule, policy, or procedure in the Manual or elsewhere that requires NCCA to review an application while a lawsuit is pending over NCCA's review process of the applicant's previous application. Again, we defer to NCCA's interpretation of its own procedures as that interpretation is not an unreasonable construction of plain and unambiguous language. (*Cal. Dental, supra,* 23 Cal.3d at p. 354.)

B. *Biased Decision-Makers*

Breining contends those who decided not to consider the 2013 application were biased because they had advocated against Breining with respect to the stay. Breining contends fair process requires a neutral decision-maker, relying on *Applebaum v. Board of Directors* (1980) 104 Cal.App.3d 648, at page 657. In *Applebaum*, an ad hoc committee of a hospital recommended suspending plaintiff's hospital privileges and the executive committee agreed. (*Id*. at pp. 652-653.) We found plaintiff was denied fair process because the ad hoc committee included plaintiff's accuser and the executive

17

committee had overlapping members with the ad hoc investigative committee. (*Id.* at pp. 659-660.) We discussed the factors that preclude a fair and impartial tribunal. The most destructive to impartiality is bias arising from a pecuniary interest, and personal embroilment in the dispute also voids an administrative decision, but neither prior knowledge of the facts nor a prehearing expression of opinion on the result is a disqualifying bias. (*Id.* at p. 657.)

The individuals who made the decision not to review Breining's 2013 application were Chair Donald Balasa, Vice-Chair Chad Buckendahl, and Executive Director Denise Roosendaal. Breining contends they were biased because they *advocated* against Breining as to the stay. The record indicates they submitted declarations in opposition to the stay. Balasa described the correcting errors policy; Buckendahl recounted the considerable time spent on Breining's application; and Roosendaal provided a history of NCCA, its Manual, and the two-and-a -half-year process of reviewing Breining's application for renewal. In short, they provided factual information which was used by counsel to argue against the stay. This is not the type of advocating condemned in *Applebaum*, where the accuser was part of the decision-making body, nor does it show a personal embroilment in the dispute. Breining has failed to show a disabling bias.

C. *Lack of a Rational Basis for Decision*

Breining contends NCCA's decision not to review the 2013 application lacked a rational basis. As discussed, it was rational, and reasonable, to defer further review of renewal of Breining's accreditation until the issues regarding what was required for a fair process were resolved.

D. *Estoppel*

Breining contends its reasonable and detrimental reliance on NCCA's representations at the stay hearing estopped NCCA from refusing to consider the 2013 application. At the hearing on Breining's request for a stay, NCCA argued there was no

irreparable harm to Breining (a necessary element for a stay) because Breining "can reapply at any time."

" ' "Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel:  (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." ' [Citations.]"  (*Honeywell v. Workers' Comp. Appeals Bd.* (2005) 35 Cal.4th 24, 37.)

Breining fails to show the necessary inducement for estoppel.  NCCA's statements about reapplying at any time were made in the context of showing no irreparable harm, not as an invitation to reapply.  NCCA gave no assurance that it would consider a new application while the litigation was pending.  As discussed, it was reasonable to defer consideration of the 2013 application until the fair process issues in the denial of the 2012 application were resolved.

E.  *Retaliation*

Breining contends NCCA's refusal to consider the 2013 application while the litigation was pending retaliated against Breining's exercise of its constitutional right to petition for redress.  Assuming, without deciding, that a retaliation claim is proper in this context, Breining fails to show retaliation.

The elements of a retaliation claim in the employment context are:  (1) plaintiff establishes a prima facie case by showing he engaged in a protected activity, the employer subjected him to an adverse employment action, and there is a causal link between the protected activity and the adverse action; (2) defendant articulates a legitimate, nondiscriminatory explanation for its acts; and (3) plaintiff shows the

19

proffered explanation is a pretext.[5] (*Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 476.)

Assuming Breining established a prima facie case of retaliation, NCCA offered a legitimate reason to decline to consider the 2013 application--to preserve its limited resources and wait until the fair process issues were fully resolved. Breining has failed to show that reason was a pretext; rather, as we have discussed *ante*, its own reasoning in making other arguments appears to support it.

F. *Prejudice to Breining*

Breining contends the trial court misunderstood how NCCA's refusal to consider the 2013 application prejudiced it. Since we have found no error in NCCA's refusal, any prejudice to Breining is irrelevant. We do note that Breining's argument assumes its application for renewal of accreditation should have been granted, a position that the record shows is far from certain.

IV

*Attorney O'Neill's Dual Role*

Breining contends the denial of its 2013 application was unfair due to the dual role of NCCA's counsel, Philip O'Neill. Breining contends O'Neill improperly acted as both advocate for NCCA during the 2013 appeal and the opposition to Breining's request for a stay, and as an advisor to NCCA when it refused to consider the 2013 application.

"Case law establishes that an attorney cannot act as both an advocate for an agency and then as an adviser to the decision maker who reviews the result that the advocate achieved. [Citation.]" (*Sabey v. City of Pomona* (2013) 215 Cal.App.4th 489, 495.) In *Nightlife Partners, Ltd. v. City of Beverly Hills* (2003) 108 Cal.App.4th 81, at pages 84 and 85 (*Nightlife*), the same attorney advised the city that the application for

---

[5] Breining does not offer different elements of a retaliation claim in this context.

20

renewal of a permit was insufficient and later advised the hearing officer at the ensuing administrative appeal. The court held this dual role of advocate and advisor violated petitioner's right to due process. (*Id*. at p. 98.) The court noted that " 'the due process rule of overlapping functions in administrative disciplinary proceedings applies to prevent the participant from being in the position of reviewing his or her own decision or adjudging a person whom he or she has either charged or investigated.' [Citations.]" (*Id*. at p. 92.) The result in *Nightlife* is consistent with the ancient maxim, "A person cannot be a judge in his or her own cause. [Citations.]" (*Woody's Group, Inc. v. City of Newport Beach* (2015) 233 Cal.App.4th 1012, 1027.)

O'Neill's role is markedly distinguishable from that of the attorney in *Nightlife*. O'Neill served at all times as counsel for NCCA, both advising that organization and advocating for it. He did not, as did the attorney in *Nightlife*, advise the entity *that reviewed* the decision for which he advocated. O'Neill advocated for NCCA in the appeal of the denial of the 2012 application, but he did not then advise the *appeals panel* on how to decide the case, or advise the trial court (or this court) on how to decide the writ petition. The dual role problem found in *Nightlife* occurs "when both the agency and the citizen are represented by counsel at a formal hearing before a supposedly neutral decision maker who has not participated in the initial fact-finding process of the agency's investigation and prosecution of a matter, and then, 'in the midst of this seemingly adversary system,' the same lawyer who represented the agency as advocate also advises the hearing officer with regard to its decision affecting that agency." (*Nightlife*, *supra,* 108 Cal.App.4th at p. 94.) That is not what occurred here.

V

*Denial of Appeal*

Breining contends NCCA failed to follow its own Manual as to appeals. NCCA's Manual provides: "an applicant for accreditation that is materially aggrieved by a decision or other action" may appeal that action. Breining sought to appeal NCCA's

21

decision to refuse to consider the 2013 application; the basis of the appeal was " ' "a failure to conform to published standards, policies or procedures of the NCCA." ' " NCCA, through counsel, declined to hear the appeal.

We need not consider whether Breining had a right to appeal because two neutral tribunals, both the trial court and this court, have reviewed NCCA's refusal to consider the 2013 application and neither has found error. Nothing remains for the NCCA appeals panel to review. Because we cannot provide Breining any effectual relief on this point, we consider it moot. (*Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880, 888.)

## DISPOSITION

The judgment is affirmed. The Institute for Credentialing Excellence shall recover costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


                                                                   DUARTE         , J.


We concur:


     ROBIE          , Acting P. J.


     MAURO         , J.